653 So.2d 876 (1994)
Roger Eric THORSON
v.
STATE of Mississippi.
No. 90-DP-00015.
Supreme Court of Mississippi.
December 8, 1994.
Rehearing Denied April 20, 1995.
*879 Dale Robinson, Gulfport, Elizabeth Jane Hicks, James W. Craig, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Chief Justice, for the Court:
Roger Eric Thorson has appealed his conviction of capital murder and sentence to death. With the exception of the circuit court's failure to require the State to give a race-neutral reason for peremptorily challenging seven blacks from the venire, we find no reversible error. We accordingly remand this cause to the circuit court of Harrison County for the court to conduct a hearing as *880 mandated by Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and affirm on all remaining assignments of error.

FACTS
Morrison's Cafeteria is in the Edgewater Mall in Biloxi. On Wednesday, March 4, 1987, Reggie Brazille, the head chef, had been employed by Morrison's for 14 years, and Gloria McKinney, the head pastry cook, for about six years. Roger Thorson had also been an employee at Morrison's as a pastry cook, but had quit some time previously.
Brazille's working hours were 7:00 a.m. until 3:30 p.m., and he got off work that afternoon between 3:30 and 4:00, leaving work by the back door. As he was cranking his car in the parking lot, Thorson walked up and asked him if Gloria was still working. Brazille said she was and asked Thorson what was the problem. Thorson said he had some things that he wanted to get straight with her.
Rick Gaston, a patrol shift captain on the 3:00-11:00 p.m. shift with the Harrison County sheriff's department, was asked around 4:00-5:00 p.m. on Thursday, March 5, by Deputy Van McClendon to help him with a missing persons report on Gloria McKinney. They first went to the residence of Mrs. C.H. Love, Gloria's mother. Gloria had a trailer behind her mother's. Mrs. Love told them where Thorson lived on Jack Graves Road. Around 6:00 p.m. they found a run-down house on the north side of the road, and directly behind it a trailer. Several individuals came out of the trailer, and after Thorson identified himself, the officers told him they were there to see if he could provide some information on Gloria, who was missing. Gaston told Thorson he was the last person who had been seen with her before she was reported missing.
Gaston testified:
Mr. Thorson stated to me that he had, in fact, seen her at Edgewater Mall and talked to her for a few minutes as she was getting into her vehicle when she left work. The last time he saw her she was driving off in her vehicle by herself, and he was walking away just minding his business.
(R. XVIII, 1029)
With Thorson's consent, the officers went inside his trailer. The officers then asked Thorson if he would mind accompanying them to the investigation division to "get some personal history, as we do anyone we talk to, and just to discuss the situation, see if he could provide us any information, and he said yes, he did not mind [at] all because he was concerned about her [being] missing, also."
When they got to the Criminal Investigation Division, Thorson was questioned also by Gerry Tootle, investigator with the sheriff's office. At first he told Tootle he did not leave Morrison's with Gloria. Later in the questioning he said, according to Gaston, that he had got into the car with Gloria who gave him a ride "in the area of Cedar Lake Road north of I-10," where she was going one direction and he another, and she stopped and let him out. Tootle recalled that Thorson later revised his story to say that he had got in the car with Gloria, "and left with her and had traveled to the end of Popps Ferry Road at the intersection of 67." He estimated Highway 67 was approximately seven or eight miles from Morrison's. (R. XIX, 2241) Thorson was at the division office for several hours, not under arrest, and taken home by Gaston late that night. He was not given any Miranda warnings during any of his questioning on March 5.
Shortly after noon on Saturday, March 7, Gloria's body was discovered by three men in the woods off Lamey Bridge Road, outside her car. The left door of her car was open.[1]
Robert Burris, crime scene technician with the Department of Public Safety, was notified at 3:15 that afternoon by Steve Delahousey, county coroner, and arrived at the crime scene twenty minutes later. It had been raining since the previous night and the dirt road was muddy. Except for a pair of socks, Gloria's body was nude. Beneath her body the ground was dry. A nylon cord tied *881 her wrists, and a brassiere was "tied around her head, around through her mouth." (R. XVIII, 2046) The nylon cord, twenty-six and one-half inches long and burnt at each end, while binding both wrists, permitted some movement of the arms. Burris attended the autopsy, and said a 2.2 gram piece of lead was removed from her body. Examination of the interior of the Mercury car showed a great deal of blood on the driver's side. Slacks and underpants were on the other side of the front seat. The car had been wiped with white streaks, and no fingerprints were lifted.
The autopsy was performed Sunday morning, March 8, by Paul McGarry, M.D., a pathologist, assisted by Delahousey, and the time of death estimated by Delahousey to be approximately 7:00 p.m. on March 4.
Around 5:00 p.m. on Saturday, March 7, Thorson was taken by Gaston to Tootle's office for questioning, at which time he was told of Gloria's death and given Miranda warnings. That Saturday evening, Tootle testified:
The statement at that time was the same statement he had made earlier as far as him hitchhiking to Morrison's, leaving the parking lot with Gloria McKinney and traveling down Popps Ferry Road.
He changed the statement from traveling to the end of Popps Ferry Road to turning north on Cedar Lake Road and traveling just north of the interstate, and then pulling off that particular road onto a dirt road for a few minutes. He then departed her vehicle, and he hitchhiked home, and she left traveling in the opposite direction.
(R. XIX, 2259)
Thorson was questioned for several hours but made no incriminating statement. After midnight Thorson was presented with a Miranda waiver of rights form to sign, and he refused. He was formally placed under arrest at 1:30 a.m., Sunday, March 8. He was not questioned further, and there were no further developments on Sunday.
Thorson rented the trailer where he lived from Patricia (Pat) Isham Cook, who lived in another trailer next to it. On Monday morning, March 9, she informed the sheriff's office of the location where incriminating evidence might be buried. (R. XIX, 2268) Tootle and other officers accompanied by Cook went to Thorson's trailer, and around 10:00 a.m., twenty yards from his trailer, they dug up a blue jacket tied in a knot. Inside the jacket was a taped plastic bag containing a pistol, knife, watch, 50-60 .22 caliber bullets, and photograph of Gloria which had been removed from a Mississippi driver's license. (R. XIX, 2261)
After discovering this evidence, Tootle returned to his office, and Thorson was again brought in for questioning shortly after 10:00 a.m. According to Tootle and Richard Giraud, investigator in the sheriff's department, who assisted Tootle in his questioning, Thorson was again given a Miranda warning, and then shown the items found by the officers. Following this Thorson gave a verbal confession of having gotten in the car with Gloria, and then having threatened her with a knife to drive to a secluded spot, where he forced her to remove all her clothes, bound her with a rope, raped her, cut her throat, and then shot her. (R. XIX, 2305).
Following this questioning by Tootle and Giraud, Thorson was presented with a waiver of rights form at 1:49 p.m. on Monday, March 9. Following this, Donald Keith, also an officer in the Harrison County sheriff's office, was called in to operate a videotape recorder, and under questioning by Tootle, Thorson gave a detailed confession.
Thorson was 29 years of age. According to him, Gloria was his fiancee. He went to Edgewater Mall on March 4 and waited until she got off from work shortly before 5:00 p.m. When Gloria was getting into her car, Thorson told her he had come to apologize for something Pat Cook had said to her, and asked her to give him a ride to the Cedar Lake Exit. When they got to the Cedar Lake Exit, he asked her to turn left and give him a ride towards his house. They had driven past Winn-Dixie at the exit when he pulled a knife on her. He said the knife had a lock blade, was approximately 3-4 inches long, with a "copper, gold casing."
After pulling the knife on her, he directed her to continue driving. They turned off Lamey Bridge Road onto a dirt road. He *882 told her to stop the car. He then asked her to take him back and give him a second chance. He told her to remove her clothes, and put a .22 caliber revolver he had purchased from Paul Quinn on the dash of her car.
The revolver had a plastic handle, held six bullets. He said it had no serial number on it, but had "Miami or something or other on it." Gloria removed all her clothes, and Thorson had her turn her back to him. He then took a piece of rope and tied her hands behind her back. He took her brassiere, put it in her mouth and tied the back of it around her neck, giving as his reason he did not want her to bite him. He then told her to lean back on the passenger side of the car. He got out of the car and walked around to the driver's door. Gloria's head was against the passenger door, and he said her clothes were in the back seat.
Following sexual intercourse with her, Gloria slid back into the driver's seat. Thorson got out of the car, went around to the passenger side, took a towel that was in the car, wiped the dash and door handles that he thought he might have touched in an attempt to remove all his fingerprints. He then asked her if she was going to tell anybody, and she shook her head. According to Thorson, "I did not believe her and I took the knife, held it close, to the very tip of it and slit her throat."
He then got out of the car and grabbed her blue jacket, which he had previously given her, from the back seat. He took a plastic bottle of power steering fluid and her wallet, out of which he got her driver's license. He then threw the bottle and wallet into the woods.[2]
During this time, Gloria was sitting on the driver's side bleeding. Thorson then said that as he started to leave, Gloria got out of her side of the car, and had somehow gotten the brassiere loose out of her mouth, and started to scream for help.
Then, according to Thorson:
Okay, at that moment in time I took and walked around the back part of the car, up to the door right behind the driver's door on the driver's side, realizing that I had already cut her throat and that she was already suffering, I took the .22 revolver, aimed with my right hand, put my foot, right foot forward and I fired a shot.
He said the barrel of the pistol was approximately 2 1/2 to 3 feet from her right ear when he shot her. The shot hit her, she fell, and Thorson took off running.
He then went to Cook's trailer:
THORSON:
After that I took and went to Patricia Cook's trailer which is directly behind the trailer that I stay in. I went back there and told Patricia Cook that she did not have to worry about Gloria or myself anymore. She asked me at that moment in time why and I told her that I had talked to a crazy junkie-fied, supposedly friend of mine and he was supposed to have taken care of her for me. At that moment in time she asked me had I done or had I been involved in the actual dealing of her being taken care of. I told her no. After that I took and used some bleach to try to clean the knife and my hands from any gun powder or trying to clean my hands up from what I had done.
GIRAUD:
You did that with bleach?
THORSON:
Yes, sir.
GIRAUD:
Who's idea was that?
THORSON:
Bleach idea, Pat mentioned it to me.
GIRAUD:
How did it end up being mentioned, what was the conversation?
THORSON:
She said did you use the gun that you had bought from Paul, I said no, I said the other guy, I let him use it. And she says well if you had fired it that you need, that you know that they can test *883 for gun powder on your hands and all that stuff. I figured at that moment in that if she did not know that I had fired the gun but I thought at that moment in time that if I took and used the bleach that they would not be able to trace the gun powder on my hands.
GIRAUD:
Okay.
TOOTLE:
Where did you do this cleaning?
THORSON:
In her trailer.
State's Ex. E-50, p. 9.
Thorson then got a bowl from beneath the sink, scrubbed his hands, then the knife in the bleach. Thorson said the watch the officers recovered from the hole was one he thought he might have given Gloria.
Thorson said that nobody else had anything to do with his killing Gloria or had any knowledge of it.
Circuit Judge Vincent Sherry was attending a seminar in Biloxi Monday morning, March 9. Also in attendance were Dale Robinson of Gulfport and Kenneth L. Swarthout of Biloxi. Around 10:45 a.m. Judge Sherry informed these two attorneys that they were appointed as legal counsel for Thorson. The circuit court administrator telephoned Herman F. Cox, assistant district attorney, that morning and informed him that he had been assigned to handle Thorson's initial appearance before the circuit judge, and that it had been set for 3:00 p.m. Cox in turn called the sheriff's office instructing them to have Thorson before the court at 3:00 p.m. Cox telephoned Judge Sherry around noon about another matter, and was told the initial appearance had been set for 1:00 rather than 3:00 p.m. Cox telephoned the sheriff's office, but neither Tootle nor Giraud was there. Cox told a secretary that the hearing was to be at 1:00 p.m., but the message was not relayed to Tootle or Giraud. (R. XI, 718-19) The initial appearance actually took place around 4:15 that afternoon. Neither Swarthout nor Robinson made any attempt to talk with Thorson before the initial appearance.
At the initial appearance that afternoon, Cox read an information executed by Cono Caranna, II, the district attorney, charging Thorson with capital murder contrary to Section 97-3-19(2)(e) (Supp. 1987) of the code committed while engaged in the commission of the felonies of rape and kidnapping.
Defense counsel moved ore tenus for discovery, a medical and psychiatric examination of Thorson, to preserve all evidence, a preliminary hearing and a speedy trial, along with funds to hire a private investigator. On March 15 the court authorized the defense to employ Ralph Paas as a private investigator.
A second hearing was held before Judge Sherry on March 20 to consider pretrial motions. Cox advised the court that he had informed Robinson that the State expected to present Thorson's case to a Biloxi grand jury in April, and hopefully to put him to trial in May or June, all to accommodate the demand for a speedy trial. The court noted the conflict between defense counsel's motion for a speedy trial and for a psychiatric assessment. Thorson was indicted for capital murder June 3, 1987, for committing the crime of murder while engaged in a felonious kidnapping.
A third extended hearing was held before Circuit Judge Jerry O. Terry from February 24-March 1, 1988. In the interim Judge Sherry had been murdered some time in September, 1987, and at the general election in November, 1987, Glenn Cannon was elected to succeed Caranna. At this hearing Ed Parsons, assistant district attorney, represented the State.
The court overruled the defense motion that proper venue was in the first judicial district because the body was found there, finding that Cedar Lake Exit being in the second district, either district was proper for venue purposes.
The court also overruled the defense motion to suppress Thorson's confession, based upon the testimony of Tootle and Giraud as above noted and by them both that Thorson never requested an attorney. Thorson testified that he had requested an attorney from Giraud. Keith also testified at this hearing that Thorson's statement, insofar as anything which occurred in his presence, was free and voluntary.
*884 Also brought out at this hearing was that before he confessed Thorson had been given a polygraph examination twice by Giraud, neither of which indicated he was lying when questioned about Gloria's death. The results of these tests were never permitted to be introduced into evidence.
Pretrial hearings were held March 18 and 29, 1988, to reconsider violations of Rules 1.02, 1.04 and 4.06 of the Criminal Rules for failure to take Thorson before a judicial officer without undue delay, failure to give him a preliminary hearing, and discovery violations, which were again overruled. The court also overruled a motion to rule in advance of trial that if Thorson took the witness stand he would not be cross-examined about a prior conviction.
Robinson also complained of the State's failure to preserve evidence in that they had been unable to locate Pat Cook and Richard Isham, for whom they had issued subpoenas. The circuit judge stated that he was not going to require the State to go out and locate witnesses; if the State knew it should inform defense; otherwise, it was the responsibility of the defense to secure its witnesses. The circuit judge then reminded the defense that a private investigator had been authorized for the defense, and that if the investigator had found them, it was the responsibility of the defense to keep up with them. (R. XI, 760-64).
The final pretrial hearing before the first trial was held May 11, 1988, to consider a motion to dismiss for failure to provide Thorson a speedy trial. Thorson was also arraigned at this hearing. As one of Thorson's reasons for dismissal under this motion, Paas testified about interviewing Pat Cook, who told him Thorson was at her trailer at 2:00 p.m. and again at 5:30 that afternoon on March 4, 1987. Paas said that her trailer was some six and a half miles from the location of Gloria's body. He also said that Cook had told him Thorson was not able to commit the crime with which he was charged, that he was a "wimp." Cook provided Thorson with food, shelter, and affection according to Paas. Cook had also told him that her son, Richard Isham, was involved in the slaying. Cook also told him that Pat Brossett had made a statement indicating he was the killer. Brossett was later questioned by defense counsel and denied being involved in the slaying. The defense said they wanted Isham because they were informed that the officers had used Isham to secure a confession from Thorson on March 8.[3]
Paas said the two were then in Michigan.
Paas had testified February 26, 1988, that he interviewed Isham and Cook shortly after he was appointed in March, 1987. (R. X, 484) He further testified when he tried to locate them a few weeks prior to the February, 1988, hearing that he was unable to do so.
At the May 11 hearing, Paas said he had also talked with Betty Pelvin, Cook's mother, who had also moved to Michigan. According to him, Pelvin, along with a neighbor, Mrs. Stringer, had also heard Brossett make the statement to Cook indicating he killed Gloria. The record shows no effort by the defense to locate or subpoena this neighbor, Mrs. Stringer. Also, Greg Broussard, the officer who interviewed Isham on March 8, 1987, was never subpoenaed by the defense.
According to the defense, the delay had kept them from having Brossett, Cook, Isham and Pelvin as witnesses. The court ruled that the State was not required to "preserve and hold witnesses," (R. XII, 860) that every protection had been afforded the defense to prepare for the case, and that the witnesses had been gone since the previous summer or fall. The court also pointed out that the defense had filed 41 motions, which was inconsistent with their demand for a speedy trial. (R. XII, 867-72)
The first trial began May 16, but a mistrial was declared May 26 because two of the jurors' motel room was burglarized.
Motions were heard by the circuit judge on August 26. A motion for a continuance or in the alternative a change of venue was sustained, *885 and the trial ordered to be held in Walthall County. (R. XV, 1592-94)
Trial began in Walthall County September 19. There were thirteen blacks on the venire. The State exercised seven peremptory challenges on blacks. The defense moved the court to require the State to give a racially-neutral reason for these challenges, but the court overruled the motion, holding that Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was inapplicable because the victim and the accused were white. Four blacks did sit on the jury, and the two alternate jurors were blacks.
At trial Paul Quinn testified that he sold Thorson a snub-nosed.22 caliber pistol for $25.00 about a month before March 4, 1987. It was quite rusty when he sold it to Thorson, and after Thorson had cleaned it, he showed it to Quinn. The pistol found in the hole was identified by Quinn as the pistol he sold Thorson.
John Michael Allen, a firearms expert from the Mississippi Crime Laboratory, testified that the bullet removed from Gloria's head was a .22 caliber, and its marks were consistent with the marks of bullets fired from this pistol. He could not, however, either positively include or exclude the pistol as having been the pistol which fired the bullet removed from Gloria's corpse.
None of Thorson's fingerprints were found on Gloria's car. Likewise, with the exception of the pistol, none of the blood or hair samples produced any positive evidence.
The crime laboratory did rule out the possibility that the semen found in Gloria's vagina was Thorson's, she being a secretor and he a non-secretor. Prior to and during trial, the defense moved the court to permit evidence that the semen was not Thorson's, but the court excluded this evidence because Thorson was not charged with rape in the indictment.
The trial testimony of the facts surrounding Gloria's murder were as related in the factual summary. The videotape of Thorson's confession was played before the jury.
When the State rested, the defense moved to introduce into evidence through Paas what Cook had told him, namely: that Thorson was at her trailer at "a quarter to six" on March 4, and of the statements Brossett had made to Cook. In addition the defense sought to offer what Pelvin had said to Paas. The defense also sought to offer into evidence through Helen Skupien, a sister of Thorson's mother, that she had met Cook the Sunday after Thorson was arrested (R. XX, 2599; XXI, 2600-02) and Cook told her she was pretty sure two other people were involved. Also, testimony of Thorson's mother, Juanita Thorson, was proffered to prove that in May, 1987, Cook had told her Thorson could not have committed the crime because he was at her home at 5:30 the afternoon of March 4, 1987. Cook told her that she remember the time because she was a diabetic and had to take insulin. The court sustained the State's objection to this proffered testimony.
William Bauder, the husband of Cook, testified that he saw Thorson about 6:00 p.m. on March 4, 1987, at their trailer, and Thorson was in the kitchen with his wife when he went to bed at 10:30 that night. On cross-examination Bauder testified that he had told the State previous to trial that the day he saw Thorson at 6:00 p.m. was the day when the police officers came to their house.
The defense rested. The jury following deliberations found Thorson guilty of capital murder, and at the sentencing hearing sentenced him to death. Thorson has appealed.

LAW

I. THE CONFESSION
Thorson's first five assignments of error argue reasons his confession was inadmissible and should have been suppressed.
He first maintains the confession was a product of an illegal arrest, and second that the circuit judge lacked probable cause to issue a warrant for his arrest. We reject them both.
Thorson was not taken into custody until late Saturday afternoon, March 7, 1987, and placed under arrest shortly after midnight. At that time Gloria's body had been found, and it was clear she had been murdered. Thorson was the last person who had seen her alive on Wednesday, March 4. The officers *886 knew that when Thorson was first questioned on Thursday, March 5, he said that he did not get in the car with Gloria on the previous day, but had only talked to her in the parking lot at Morrison's. There was no reason for his memory not to be absolutely clear on this salient fact. When next questioned at the Criminal Investigation Division office on Thursday, he said he in fact got in the car with her and rode to the Cedar Lake Road at I-10 Exit (some several miles), where he got out. On Saturday he told Tootle he had ridden further with her to a dirt road where he got out and hitchhiked home.
Probable cause consists of "facts and circumstances" within the officers' knowledge "to warrant a prudent man in believing" Thorson had committed the offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). See also, Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986); Swainer v. State, 473 So.2d 180, 186 (Miss. 1985). With this variance in facts related by Thorson about which there was little room for memory failure, the officers would have been imprudent not to believe Thorson was criminally implicated in her murder in some way. This Court has affirmed homicide convictions when the defendant was the only eyewitness to the slaying and where he gave conflicting statements of relevant circumstances surrounding the slaying. Harris v. State, 446 So.2d 585, 589 (Miss. 1984); Bell v. State, 443 So.2d 16, 21 (Miss. 1983); Clingan v. State, 404 So.2d 1386, 1389 (Miss. 1981); Smith v. State, 394 So.2d 1367, 1369 (Miss. 1981); Hancock v. State, 299 So.2d 188, 189-90 (Miss. 1974).
Even if it were conceded the officers lacked probable cause for Thorson's arrest, his confession was not a product of the arrest. He denied any involvement in Gloria's slaying on Saturday, was not questioned on Sunday, and it was only after he was told of the incriminating items the officers found buried Monday morning that he gave his confession. This physical evidence was unconnected with Thorson's arrest; it came from separate questioning of Cook. Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); Brown v. Illinois, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); Coleman v. State, 592 So.2d 517, 521 (Miss. 1991).
Thorson's third assignment argues that there was an unnecessary delay from the time of his arrest until he was taken before a judicial officer, in violation of Rule 1.04 Uniform Criminal Rules and the 4th Amendment. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Thorson was taken into custody for questioning late Saturday afternoon, and his initial hearing was held Monday afternoon, within 48 hours.
The fact that Thorson was in custody and the necessity of an initial hearing was undoubtedly called to the attention of Judge Sherry by the law enforcement officers at some time prior to 10:45 a.m. Monday, March 9, because at that time he notified Robinson and Swarthout that they were Thorson's legal counsel. Although the officers were continually seeking evidence, there is nothing to show that the officers purposely were holding him in custody to gather sufficient evidence to justify his arrest. The hearing undoubtedly would have been heard at 1:00 p.m. on Monday without the mix-up in time caused by the court administrator, not the law enforcement officers. County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), addressed this 4th Amendment right and stated that a probable cause determination made within 48 hours will normally be sufficient. It further held:
This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate Gerstein if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in *887 transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.
Id. at 56-57, 111 S.Ct. at 1670. See also, Nicholson v. State, 523 So.2d 68 (Miss. 1988).
The record in this case also shows that Thorson was given all the Miranda warnings prior to giving his confession, his attorneys were at perfect liberty to contact him at any time after 10:45 a.m. on Monday morning and advise him of his rights, but they made no effort to talk to him prior to the hearing that afternoon. His confession was not a product of any delay in taking him before a magistrate, and was therefore admissible. Veal v. State, 585 So.2d 693, 699 (Miss. 1991).
Thorson next argues that his 5th and 6th Amendment rights were violated. The circuit judge held a lengthy suppression hearing in which Tootle, Giraud, Keith and Thorson all testified. Both Tootle and Giraud testified that prior to making any confession, Thorson was given all Miranda warnings, and denied his asking either of them for an attorney at any time. Keith's only participation was to operate the camera when Thorson gave his videotaped confession. Thorson testified he asked Giraud for an attorney. Giraud denied it. Thorson never testified he made any such demand of Tootle, who was the main interrogator. Thorson also testified Giraud promised him leniency, likewise denied by Giraud. In Balfour v. State, 598 So.2d 731 (Miss. 1992), we held:
Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence. [Citations omitted.]
Id. at 742.
Following the suppression hearing the circuit judge found in this case that Thorson's confession was freely and voluntarily given. The record supports his finding, and that Thorson had been given all Miranda warnings. Coverson v. State, 617 So.2d 642, 646-47 (Miss. 1993).
We are not confined in this case to a written record, but have the videotaped confession of Thorson. Thorson, who had once before been convicted of a felony, selling marijuana, was familiar with his Constitutional rights to remain silent, that anything he said could be used against him, and to an attorney. This is further evidenced by the fact that he refused to sign the waiver form when presented to him. The videotape does not suggest any coercion, and in it Thorson stated that he read the warning form, understood it, and understood his rights. We find the confession to have been freely and voluntarily given and competent evidence.
Thorson further argues that his initial refusal to sign the waiver form constituted a demand for an attorney. While this might offer some support for his contention that he in fact requested an attorney (denied by both Giraud and Tootle), a refusal to sign a waiver does not in and of itself constitute a demand for an attorney. Mohr v. State, 584 So.2d 426, 429 (Miss. 1991); United States v. McDaniel, 463 F.2d 129 (5th Cir.1972); North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); McNeil v. Wisconsin, 501 U.S. 171, 177-78, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). United States v. Ramos, 448 F.2d 398 (5th Cir.1971), and United States v. Heldt, 745 F.2d 1275 (9th Cir.1984), cited by Thorson, are both factually distinguishable in that in both those cases interrogation continued without interruption when the accused refused to sign a waiver form. In this case, Thorson was not questioned again until more than 32 hours had lapsed when the officers gave him damning information connecting him to the crime, and he was again advised of his rights before questioning him further. We therefore find no violation of Thorson's 5th or 6th Amendment rights against compulsory self-incrimination or right to an attorney.

II. AGEE VIOLATION
Thorson next argues that his confession was obtained in violation of Agee v. *888 State, 185 So.2d 671 (Miss. 1966). At the suppression hearing Tootle, Giraud and Keith testified, and supported the State's contention that Thorson received all Miranda warnings again on March 9, and that he did not request an attorney.
Thorson testified that when he was taken to the Criminal Investigation Division on Saturday, March 7, a Major Cook asked him some questions, and that he was abusive, and accused him of sexual acts that he had not committed. R. IX, p. 382. He also said he was yelled at by Giraud, Cook and some man he could not identify. Thorson argues that under Agee the State should have been required to produce Cook and the unidentified officer in denial of his statements as to what transpired March 7.
Thorson also testified, however, that the reason he gave his confession on March 9 was because he did not think his request for an attorney would be granted, and Giraud had promised him leniency, also denied by Giraud.
In Agee we held:
The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. Lee v. State, 236 Miss. 716, 112 So.2d 254 (1959). When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. Lee v. State, supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness. See also Holmes v. State, 211 Miss. 436, 51 So.2d 755 (1951).
Agee, 185 So.2d at 673.
This Court's decision in Agee was rendered in April, 1966, two months prior to the United States Supreme Court's seminal Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the time of our decision in Agee, there was no requirement in order for a confession to be admissible in this State that the accused be first affirmatively informed that he did not have to make a statement, that anything he said could be used against him in court, and that he had a right to legal counsel before making a statement. The State was required only to show in order for the confession to be competent evidence that it had refrained from any kind of coercion or offer of leniency. Nicholson v. State, 235 Miss. 273, 108 So.2d 842, 843-44 (1959); Holmes v. State, 56 So.2d 815, 817 (Miss. 1952); Newell v. State, 209 Miss. 653, 48 So.2d 332, 339 (1950); Street v. State, 200 Miss. 226, 26 So.2d 678, 679 (1946).
The principle enunciated in Agee remains sound, but its importance to an accused has receded in view of the strong affirmative mandates of Miranda. In Abram v. State, 606 So.2d 1015, 1030 (Miss. 1992), we held, "Only those persons who are claimed to have induced a confession through some means of coercion are required to be offered by the State under Agee." We hold that any alleged statement made by Cook and some unidentified person on March 7 at which time Thorson revealed nothing had no bearing on Thorson's confession on the Monday following. Indeed, he never claimed that they did. Here Thorson informed the officers on Monday, March 9, that he had read and understood his rights, and there is nothing, as above noted, about any of this videotape suggesting coercion or mistreatment of any kind. Mettetal v. State, 602 So.2d 864, 868 (Miss. 1992). We find the requirements of Agee satisfied in this case, and in sum the confession properly admitted into evidence.

III. MARCH 5, 7 STATEMENTS
As noted, on March 5 Thorson gave different statements as to his contact with Gloria March 4, first stating he did not get *889 into the car with her, and second that he rode until she let him off at the Cedar Lake Exit on I-10. Thorson's argument that these also should have been suppressed is without merit, because in the questioning of Thorson on Thursday, March 5, he was not under arrest, the officers were simply seeking information about a missing person. He voluntarily went with them to the sheriff's office, was free to leave, and was taken home by an officer when the questioning was over.
On March 7 Thorson told the officers that he had ridden with Gloria to another location, in fact nearer to where her body was found, than what he had told them Thursday. It was never contended by Thorson that what he related to the officers on Saturday was a result of coercion on threats from Cook or the unidentified officer. On the other hand, both Tootle and Giraud positively testified that on Saturday he was given Miranda warnings prior to questioning him.[4]

IV. PRETRIAL RULING ON CROSS-EXAMINATION
Thorson sought by a motion in limine to prevent the State from cross-examining him about a prior drug conviction in event he took the stand. The circuit judge refused to rule in advance of trial that the subject would be off-limits in cross-examination.
Thorson argues this ruling was a factor in his decision not to take the witness stand. His argument fails for two reasons. If he had a valid legal objection to being cross-examined about a prior conviction, he was not denied the right to assert it, and presumably have it sustained if correct in his contention. The obviously appropriate time to assert it was if and when the State sought to cross-examine him on the subject. When a trial judge can know in advance of trial the circumstances under which evidence will be sought to be introduced, he can safely make a ruling. He should not be called upon, however, to anticipate which of several circumstances will occur. Evidence inadmissible for one purpose may be relevant and competent for another. Brent v. State, 632 So.2d 936, 943 (Miss. 1994) (citing M.R.E. 105; see U.S. v. Martinez, 962 F.2d 1161, 1165 (5th Cir.1992); U.S. v. Abel, 469 U.S. 45, 56, 105 S.Ct. 465, 471, 83 L.Ed.2d 450 (1984); Lubbock Feed Lots. v. Iowa Beef Processors, Inc., 630 F.2d 250, 261 (5th Cir.); reh'g denied 634 F.2d 1355 (5th Cir.1980)). And, a trial judge should not be faulted for refusing to rule in advance how he will rule when he does not, indeed cannot, know the context in which evidence will be offered. Butler v. State, 608 So.2d 314, 324 (Miss. 1992); Settles v. State, 584 So.2d 1260, 1265 (Miss. 1991); McInnis v. State, 527 So.2d 84, 87 (Miss. 1988).
Second, we cannot be impressed that Thorson's fear of the jury's being informed that he had once been convicted of the sale of marijuana was a significant factor in his decision. When Thorson chose not to take the witness stand he obviously knew that his videotaped confession to a grisly slaying would go completely unchallenged. The jury would see the tape of him relating in detail how he had murdered Gloria, all without dispute from him. He also knew that had he taken the witness stand, he would have been cross-examined about this confession. The possibility of having also to concede that once he had been convicted of the sale of marijuana pales into insignificance compared to his damning confession.

V. SPEEDY TRIAL RIGHT
The right to a speedy trial is protected by the Sixth and Fourteenth Amendments to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890. "[F]or constitutional purposes, the right to a speedy trial attaches and time begins to run with arrest." Spencer v. State, 592 So.2d 1382, 1387 (Miss. 1991); Handley v. State, 574 So.2d 671, 674 (Miss. 1990); Smith v. State, 550 So.2d 406, 408 (Miss. 1989). Therefore, Thorson's constitutional right to a speedy trial began to run on March 8, 1987, the date of his arrest.
*890 In determining whether the constitutional right to a speedy trial has been violated, Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), gives the following four factors to consider: (1) length of the delay; (2) reason for the delay; (3) defendant's timely assertion of his right to a speedy trial; and (4) resulting prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. at 2192. The Court further held:
We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.
Barker, 407 U.S. at 533, 92 S.Ct. at 2193.

A. Length of the Delay
In regard to this first factor, this Court has stated:
This first step under Barker, the length of the delay, operates as a "triggering mechanism." Smith v. State, 550 So.2d 406, 408 (Miss. 1989). If the delay is not presumptively prejudicial, then there is no need for further inquiry. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182 [2192], 33 L.Ed.2d 101 (1972).
Spencer, 592 So.2d at 1387.
For Thorson, the time between arrest and trial was 434 days, slightly over fourteen (14) months. In non-capital cases we have held a delay of eight (8) months or more is presumptively prejudicial. Spencer, 592 So.2d at 1387 (citing Smith v. State, 550 So.2d 406, 408 (Miss. 1989)). We examine the remaining Barker factors.

B. Reason for the Delay
"Delays attributable to the defendant toll the running of time." Spencer, 592 So.2d at 1387 (citing Vickery v. State, 535 So.2d 1371, 1375 (Miss. 1988); Perry v. State, 419 So.2d 194, 199 (Miss. 1982)). "Where the prosecution fails to show good cause for the delay, this factor is weighed against the prosecution." Spencer, 592 So.2d at 1387 (citing Handley, 574 So.2d at 676; Perry, 419 So.2d at 199)).
Defense counsel filed a motion to demand a speedy trial on June 23, 1987. (CP. I, 50; R. 769) A hearing on the motion to dismiss for lack of a speedy trial was held on May 11, 1988. (R. XI, 767)
Defense counsel filed 41 pretrial motions on June 23, 1987. (CP. I, 30-78) Arraignment and hearings on these motions were set to be heard on July 9, 1987, but were not heard that day. (CP. I, 81; R. 783) Arraignment and motions were again set to be heard on August 20, 1987, but were postponed at the request of the prosecution. (CP. I, 82; R. 783)
Due to other trial dates set for the defense attorneys in October, December 7 was the next available date on which both defense attorneys had no conflicts. (R. XI, 777-788) A trial ran over into the 8th of December and one of the defense attorneys was not available that day so no hearing took place in December. The next date set for arraignment and hearings on the motions was for February 25, 1988. (CP. I, 85) The hearings on the motions were heard by the court beginning on February 24 and continued through the 29th.
The court then set the cases for trial March 21, 1988, (CP. I, 125), but because one defense attorney had another trial set for that date and the other had a trial set for April 18, trial was postponed to the next available date, May 16, 1988. (CP. I, 388; R. XI, 772) On May 11, 1988, Thorson was arraigned and hearing was held on his motion for a speedy trial. Trial began on May 16, 1988, on which date the defense moved the court for a continuance, which was denied. (R. XXI, 886-902) That trial resulted in a mistrial, and the second trial began on September 19, 1988.
Prior to the hearing on the motion to dismiss for lack of a speedy trial, the trial judge noted that the case was initially to be tried before Judge Vincent Sherry, who was murdered around September 15, 1987. Judge Terry was appointed to replace Judge Sherry on October 30, 1987. He also noted that on October 1, 1987, Judge W.M. O'Barr *891 was appointed to lend assistance to that district due to overcrowded docket conditions. (R. XI, 793-794)
In its ruling denying the motion, the trial court pointed out that the defense made the June 23, 1987, motion demanding a speedy trial in conjunction with 40 other motions. The judge stated:
If Thorson had been put to trial within the term of court or at the next term of court after these motions were filed, if these motions were filed in honesty, which I'm sure they were, he would have been going to trial without proper preparation and the next claim would have been incompetency of counsel or ineffectiveness of counsel.
He found that under the totality of the circumstances and in consideration of the Barker factors, Thorson had not been denied his right to a speedy trial. (R. 867-872)
The State asserts that the delay in setting a date for hearing pretrial motions from August 23 to December 7, 1987, was a result of defense counsel's conflicts. Thorson argues that this 99-day delay should not be attributed to the defendant because the conflicts of defense counsel were other capital murder cases to which they were appointed by the State.
Another 55-day delay resulted when the trial date set for March 21, 1988, was re-scheduled for May 16, 1988, due to defense counsels' conflicts.
The State also contends that its inability to bring this case to trial was impeded by psychiatric, mental, physical, and IQ examinations requested by the defense, and also that extensive demands for discovery requested by the defense along with defense counsels' other commitments also contributed to the delay.
There is no showing of a wilful effort by the State to delay Thorson's trial, or that it was negligent in doing so. Because of their very serious nature, capital murder cases require much greater, time-consuming preparation. In this extremely difficult case, in which Thorson was ably and aggressively defended at every stage, we must not ignore the fact that the circuit judge to whom the case had been assigned for seven months, was murdered in September, 1987. Also, there was a complete turn-over in the district attorney's office at the end of 1987.
We find reasonable justification for the time which transpired before trial in this case. Bailey v. State, 463 So.2d 1059 (Miss. 1985); Diddlemeyer v. State, 398 So.2d 1343 (Miss. 1981).

C. Defendant's Assertion of His Right to a Speedy Trial
The defendant asserted his right to a speedy trial at his initial appearance on March 9, 1987, at hearings on pretrial motions on March 20, 1987, and by pretrial a motion filed on June 23, 1987. (R 7, 26, 62, 767, CP 50)

D. Prejudice
More serious is Thorson's contention that the delay in going to trial prejudiced his defense because of the loss of witnesses Cook, Isham, Pelvin and Brossett.
We find no prejudice by Cook's and Pelvin's absence insofar as they would testify to a statement made by Brossett that "if Roger [Thorson] says anything about me in this matter, I'm going "F" word in the ass and cut his throat, just like we did that girl." (R. XX, 2590-91).
In the first place, this was inadmissible hearsay. Rule 804(b)(3) Miss.R.Evid.[5] There was no attempt to show that this statement, exposing Brossett to prosecution and exculpating Thorson, was accompanied *892 by any corroborating circumstances clearly indicating the statement to be trustworthy. Second, Brossett was under subpoena and there was no attempt to attach him, or show that he was unavailable as a witness. Miss. Code Ann. § 99-9-19. Third, the defense claimed another witness, Mrs. Stringer, a neighbor, also was present when Brossett made the statement. No effort was made by the defense to call her as a witness. Finally, Brossett denied to Paas and defense counsel any involvement in the slaying.
As to the defense claim that Isham had been used to obtain Thorson's confession, in the first place Isham was interviewed shortly after midnight on Sunday morning, March 8, 1987. Thorson refused to sign the Miranda waiver when he was shortly afterwards put under arrest. Also, Thorson never claimed in the suppression hearing that Isham had anything to do with his confession. Finally, Isham was questioned by Officer Greg Broussard, and if there was an improper effort by any law enforcement officer to use Isham's services to get Thorson to confess, it is strange that the defense never called Broussard as a witness to establish such fact.
More troubling is the proffered testimony of Cook that Thorson was at her trailer around 6:00 p.m. on March 4. This, of course, would have been competent testimony. Here, however, her husband, William Bauder, did in fact testify to the same fact, and Cook's testimony would have been cumulative.
Balanced against all this is the question: Had the trial been conducted in the fall of 1987, would Cook, Pelvin or Isham have been present in any event? The record shows that within a few days following Thorson's arrest the court by special order authorized the defense to employ Paas as a private investigator. Basic defense strategy mandated that defense counsel at the earliest opportunity interview Isham, who lived with Thorson, and Cook, from whom he rented the trailer. No doubt Paas did just that. Yet no effort was ever made by the defense to put any of these witnesses under process until March 22, 1988. As the circuit judge noted, the State was under no obligation to secure these witnesses. The defense had every opportunity to put them under process prior to leaving this state. The harm, if any, to the defense was of its own making.
We conclude that the delay in not having the trial until May, 1988, in and of itself was not the cause of any prejudice to the defense.
In sum, balancing the four factors of Barker v. Wingo, we find that Thorson's constitutional right to a speedy trial was not violated.

VI. OUT-OF-STATE WITNESSES
Thorson argues error in "failure to issue out-of-state subpoenas" for Cook, Isham and Pelvin. The ready answer to this argument is that the circuit clerk issued every subpoena requested by the defense. No special request was made by the defense to the court to "issue out-of-state subpoenas."
The record shows that subpoenas were first issued for these witnesses in Harrison County, and the sheriff's office's returns show they were not found. Then, subpoenas were mailed to the addresses given by defense counsel. The subpoena mailed to Isham was returned because of insufficient address.[6]
A state has no sovereign authority to issue process to another state requiring a person therein to appear as a witness in a court within the state. Many states have compacts to assist one another in securing the attendance of a prosecution witness. Mississippi has such an agreement, set forth in Miss. Code Ann. § 99-9-27, et seq. (1972). We are not required to address the question of whether the State of Michigan would have honored a request from the circuit court of Harrison County to secure the attendance of these witnesses in Mississippi for the simple reason that the court was never requested to *893 utilize the provisions of the uniform law to secure the attendance of witnesses from without the state.[7] The circuit court should not be held in error for failing to do something it was never asked to do.

VII. NO PRELIMINARY HEARING
At the initial March 9, 1987, hearing, the defense requested and the circuit judge authorized a preliminary hearing. This request was renewed both before and after Thorson's indictment. For some reason the State never had a preliminary hearing prior to Thorson's indictment on June 3, 1987, and the circuit judge saw no need of one following indictment. Failure to afford Thorson a preliminary hearing in this case prior to indictment was not reversible error, and failure to afford him a preliminary hearing following indictment was not error. Mayfield v. State, 612 So.2d 1120, 1128 (Miss. 1992); Addkison v. State, 608 So.2d 304 (Miss. 1992); Hansen v. State, 592 So.2d 114, 122 (Miss. 1991); Willie v. State, 585 So.2d 660, 669 (Miss. 1991).

VIII. POLYGRAPH TESTS
No error was made in refusing to admit the results of the polygraph tests administered by Giraud. The results of polygraph tests have not reached that stage in scientific reliability justifying their competency as substantive evidence. Garrett v. State, 549 So.2d 1325 (Miss. 1989).

IX. SEMEN EVIDENCE
Thorson contends it was error for the circuit court to exclude the laboratory results showing that the semen found in Gloria's body did not come from him. The circuit judge reasoned in excluding the evidence that Thorson was not charged with rape and that the result of the test would tend to confuse or mislead the jury. This was within the court's discretion. Johnston v. State, 618 So.2d 90, 93 (Miss. 1993). Thorson's confession, never challenged for accuracy, was corroborated by numerous physical facts: the location and position of the body, the blood, the gun shot wound, the throat laceration, the rope around her wrists, the bra tied around her head, the power steering fluid found in the woods, to name some. Thorson's statement concerning the description of the blue jacket, plastic bag, gun, knife, watch, bullets and photograph from McKinney's drivers license, the precise location of these items and the manner in which they were wrapped and buried was corroborated by the physical evidence recovered.
The that fact semen found in her body did not come from Thorson is explainable in several ways other than the supposition he did not rape her as he confessed to doing, and its exclusion under the facts of this case was within the court's discretion.

X. NO MANSLAUGHTER INSTRUCTION
No error was committed by the circuit court in refusing to give a manslaughter instruction. The only justification for such an instruction in this case would have been if the slaying had been committed in the heat of passion without premeditation. Miss. Code Ann. § 97-3-35 (1972). It is, of course, the law that a lesser included offense instruction is required "where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt." Mackbee v. State, 575 So.2d 16, 23 (Miss. 1990); Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989). While no doubt there was an abundance of heat and passion in this slaying, it was preceded by plan and deliberation. Armed with two deadly weapons, Thorson awaited Gloria, and by trickery got in the car with her whence he directed her at knife point to drive into a secluded wooded area miles away where he raped her and then cut her throat. When the knife did not quite do the job, and she got out of the car screaming, he finished her off with his pistol. He confessed that the reason he shot her was she was "already suffering." That he may or may not have decided in that bloody moment to kill her off quickly rather than letting her bleed to death to relieve suffering, as opposed to some other reason such as fearing *894 her cries would be heard, does not alter the intent from the beginning to kill.

XI. STATE INSTRUCTION S-5
The Court instructs the Jury that "malice aforethought" as charged in the indictment in this cause and as referred to in other instructions of the Court is a state of mind and does not have to exist in the mind of the Defendant for any given length of time, and if the Defendant, at the very moment of the fatal shot did so with the deliberate design to take the life of the deceased, Gloria McKinney, and not in necessary self-defense, then it was malice aforethought as if deliberate design had existed in the mind of the defendant for minutes, hours, days or weeks or even years. (Emphasis added.
(CP. VI, 1085)
This instruction has been condemned by this Court and in Windham v. State, 520 So.2d 123 (Miss. 1987), we held it to be reversible error to give it. There is absolutely no justification for a district attorney, presumably acquainted with our decisions in homicide cases, submitting such an instruction, especially in a capital murder case where critical court time and thousands of dollars of taxpayer expense are involved. The district attorney in this case can be thankful he has escaped sanctions because in this case the instruction was clearly harmless. The instruction in this case was irrelevant and harmless for the same reason that a manslaughter instruction was not justified. Holland v. State, 587 So.2d 848, 872 (Miss. 1991). There was no evidence that the slaying in this case was a sudden idea of Thorson's.

XII. SENTENCING INSTRUCTIONS
Thorson argues that the sentencing instructions violate the Eighth Amendment, citing Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). In Hansen v. State, 592 So.2d 114, 149-50 (Miss. 1991), we addressed this argument under analogous instructions and found no error. See also, Shell v. State, 554 So.2d 887 (Miss. 1989), reversed on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); and Chase v. State, 645 So.2d 829 (Miss. 1994).
Nor do we agree that the sentencing instructions shifted the burden of proof to the defendant. The instructions were essentially the same as those approved in Shell v. State, Hansen v. State, and Chase v. State, supra. In addition to this, the Court gave instruction P-22 which specifically authorized the jury to sentence Thorson to life imprisonment if it found only one mitigating circumstance and multiple aggravating circumstances, or even no mitigating circumstance, and concluding with the following paragraphs:
You are not required to find any mitigating circumstance in order to return a sentence of life imprisonment. Nor does the finding of an aggravating circumstance require that you return a sentence of death.
You, the jury, always have the option to sentence the defendant to life imprisonment, whatsoever finding you make.
(Cp. VI, 1094)
Thus, the jurors were instructed that under their oaths they had to specifically find that the aggravating circumstances existed and outweighed the mitigating circumstances before they were authorized to condemn Thorson to death. On the other hand, regardless of its finding, jurors always had the authority to sentence Thorson to life. In order to impose death, the jury's finding had to be channeled, focused. No channeling, however, was required to extend mercy and sentence Thorson to life imprisonment. The discretion was very much in Thorson's favor.

XIII. PHOTOGRAPHS
During sentencing phase the State sought to introduce nine photographs of the victim. The circuit judge examined them in chambers, excluded three, admitted three, and reserved ruling on two pending testimony of the pathologist. The State withdrew one. When the pathologist, Paul McGarry, testified, the court admitted the two upon which it had reserved ruling. These photographs, as explained by the pathologist, were probative and relevant on the issue of whether this murder was especially cruel and heinous. *895 There was no abuse of discretion in admitting them. Noe v. State, 616 So.2d 298 (Miss. 1993); Hurns v. State, 616 So.2d 313 (Miss. 1993); Hart v. State, 637 So.2d 1329 (Miss. 1994). The circuit judge was wise and prudent in making a thorough examination of these photographs in chambers prior to admitting them into evidence.

XIV. PROSECUTORIAL MISCONDUCT
Thorson has a grab bag of instances in which he charges that the district attorney himself or his assistant was guilty of prosecutorial misconduct. None merits discussion. Nor does the alleged discovery violation merit discussion.

XV. COMMENT ON FAILURE TO TESTIFY?
Thorson did not testify. During closing argument the State made the following argument:
Do you think she was suffering? Do you think that's cruel and atrocious, and what's even more than that, what do you think was running through Roger Thorson's head as he sat through watching her gag on her own blood? What do you think he was thinking?
This was no comment on Thorson's failure to take the witness stand in his own defense. Alexander v. State, 610 So.2d 320 (Miss. 1992); Ladner v. State, 584 So.2d 743 (Miss. 1991); Shook v. State, 552 So.2d 841 (Miss. 1989); Jimpson v. State, 532 So.2d 985 (Miss. 1988); Monroe v. State, 515 So.2d 860 (Miss. 1987).

XVI. VENUE
While the slaying of Gloria occurred in the first judicial of Harrison County, her abduction began in the second judicial district. Edgewater Mall is located in the second judicial district, as is Cedar Lake Road where Thorson confessed to pulling a knife on Gloria, and threatening her at knife point to drive to the secluded area where he murdered her. Thus, Thorson was subject to prosecution in either the first or second judicial district of Harrison County. Mackbee v. State, 575 So.2d 16, 38 (Miss. 1990); Myers v. State, 353 So.2d 1364, 1368 (Miss. 1978) Miss. Code Ann. § 99-11-19; Miss. Code Ann. § 99-11-3.
Thorson's argument that the change of venue made at his request was not properly certified merits no discussion.

XVII. FAILURE TO PRESERVE RECORD OF BENCH CONFERENCES
While defense counsel filed a motion June 23, 1987, to require the transcription of all proceedings at the bench outside the presence of the jury, the record shows that counsel participated in unrecorded conferences without calling it to the court's attention, or making any contemporaneous request at the time to have comments made a part of the record. It is in poor grace for counsel to participate without objection in unrecorded bench conferences and complain for the first time on appeal. We find no error here. Doby v. State, 557 So.2d 533, 536 (Miss. 1990).

XVIII. BATSON
As noted, p. 885 infra, there were thirteen blacks on the venire. The State exercised seven peremptory challenges on blacks. The court overruled a defense motion to require the State to give a racially-neutral reason for these challenges, holding that Batson did not apply: "There has been no establishment that Roger Thorson is of a minority class that falls under Batson, and I overrule your motion to require them to announce their reasons for their peremptory challenges." Thus, there was no inquiry by the court to determine whether or not the State had a racially-neutral reason for peremptorily challenging these blacks. Four blacks did sit on the jury, and the two alternates were blacks.
Contrary to the court's ruling, the State was required under Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), to give racially neutral reasons for peremptorily challenging the seven blacks from the venire under the Batson criteria.[8] While *896 great deference is given the circuit court in its ruling on whether a satisfactory explanation has been offered, Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987), cert. denied 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Simon v. State, 633 So.2d 407, 410 (Miss. 1993); Hatten v. State, 628 So.2d 294, 301-03 (Miss. 1993); Hernandez v. New York, 500 U.S. 352, 368, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395, 405-412 (1991), it is nonetheless imperative that the State be required to offer a racially-neutral explanation for its peremptory challenges. Powers v. Ohio; Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); Hatten v. State, 628 So.2d 294 at 301. Because none was given, we hold this was error, and that a Batson hearing must be conducted.
Because in the absence of the Batson issue no reversible error appears in this record, we deem remanding this cause to the circuit court solely for a Batson hearing is the proper course. Williams v. State, 507 So.2d 50, 53-54 (Miss. 1987). "Elementary notions of fairness to the State's prosecution interest require that such an opportunity now be afforded, albeit at this late date, though we recognize the difficulties obviously attendant upon an active trial attorney's remembering with any degree of reliability the reasons for each of the five peremptory challenges he made back in January of 1986."[9]
Accordingly, this cause is remanded to the circuit court of Harrison County to conduct a hearing on whether the Batson criteria were violated by the prosecution in exercising its seven peremptory challenges. The district attorney will be given an opportunity to come forward with neutral, non-race based Batson-conforming explanations for each of the peremptory challenges he used on the seven blacks excused. Thorson in turn will be afforded the opportunity to challenge and rebut any such explanations. If the circuit court should thereafter find purposeful discrimination in violation of Batson, it should order a new trial. On the other hand, should no impermissible discrimination be found, the circuit court should by opinion and order make its factual findings and certify the same to this Court.
REMANDED TO THE CIRCUIT COURT OF SECOND JUDICIAL DISTRICT OF HARRISON COUNTY TO CONDUCT A BATSON HEARING; AFFIRMED ON ALL REMAINING ISSUES.
PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
SULLIVAN, J., concurs with separate written opinion joined by PITTMAN and BANKS, JJ.
BANKS, J., concurs with separate written opinion joined by SULLIVAN, J.
SMITH, J., concurs in part and dissents in part with separate written opinion joined by DAN M. LEE, P.J., and ROBERTS, J.
SULLIVAN, Justice, concurring:
I write separately to express my views in regard to the Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), element of the present case. I concur in the majority's application of Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and remand of this case to provide the prosecution a chance to offer racially neutral reasons for peremptorily challenging seven of the black venire members. However, as I have stated previously, the proper remedy for this type of situation is the complete elimination of peremptory challenges in the trial courts of Mississippi. Hatten v. State, 628 So.2d 294, 305 (Miss. 1993) (Sullivan, J., Dissenting); Davis v. State, 551 So.2d 165, 178 (Miss. 1989) (Sullivan, J., Concurring).
As Justice Marshall's concurring opinion in Batson pointed out, "The inherent potential *897 of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system." Batson, 476 U.S. at 107, 106 S.Ct. at 1728. Requiring the prosecution to offer race neutral reasons for exclusion of black venire members is burdensome and often inefficient. "A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is `sullen,' or `distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported." Batson, 476 U.S. at 106, 106 S.Ct. at 1728.
An otherwise qualified citizen should not be excluded from a jury based on a "gut" feeling of one side or the other. To allow exclusion of the juror without giving cause too easily provides the opportunity for racism or other impermissible bases to taint jury selection. If, as the law now exists, selection of jurors may be challenged when impermissible motives are suspected it is in the best interests of justice and efficiency to eliminate peremptory challenges completely, for both sides, and require that cause be given.
PITTMAN and BANKS, JJ., join this opinion.
BANKS, Justice, concurring:
I concur with the result reached by the majority in this case. I write separately to express my discomfort with the position taken in Part IV of the opinion on the issue of motions in limine regarding the availability of prior conviction evidence for impeachment purposes.
As I noted in Settles v. State, 584 So.2d 1260, 1265 (Miss. 1991), ordinarily the trial court should have no problem giving a preliminary ruling as to whether a particular conviction can be used for impeachment purposes. In the instant case, the conviction involved was one for sale of marijuana. We have held that burglary and arson convictions are not available for impeachment purposes. Tillman/Stevenson v. State, 606 So.2d 1103 (Miss. 1992) and McInnis v. State, 527 So.2d 84 (Miss. 1988). It follows that a conviction for sale of marijuana would have even less impeachment value. Requiring a trial judge to rule in advance that this conviction was not available for impeachment purposes has no risk whatever. This is especially so in light of the fact that all rulings in limine are advisory and, should circumstances change, the ruling may change. I cannot imagine any circumstances changing which would render a sale of marijuana conviction a valid impeachment device, given this Court's pronouncements in Tillman/Stevenson and McInnis. I would find an abuse of discretion in the failing to give a ruling in limine.
That said, however, Thorson has failed to preserve the issue because he failed to proffer his proposed testimony. Settles v. State, 584 So.2d at 1265; Saucier v. State, 562 So.2d 1238, 1245 (Miss. 1990). Moreover, in the colloquy regarding the admissibility of this conviction, the prosecutor acknowledged that it had no probative value standing alone and stated that he would seek to introduce it only if the defendant testified that he had never committed any crime, or if he testified that he did not know of his right to an attorney. While admissibility to rebut any proposed testimony concerning an attorney is questionable, it is clear that within the context of this case, it is difficult to imagine, as the majority observed, that the prospect of this conviction being admitted deterred Thorson from taking the stand. The error in failing to rule in limine is, therefore, harmless.
SULLIVAN, J., joins this opinion.
SMITH, Justice, concurring in part, dissenting in part:
The majority today decides convicted killer Thorson raises meritless assignments of error with the exception of the Batson issue. Because I am of the opinion that the Batson issue, too, is without merit, I cannot agree that it is necessary to remand for a hearing thereunder. Accordingly, I concur with all issues except issue eighteen (18) to which I dissent.
*898 It is true that in Powers v. Ohio, it was decided that a white defendant had standing to challenge the use of peremptory challenges against minority venirepersons in order to exclude them on the basis of their race. See also Bush v. State, 585 So.2d 1262 (Miss. 1991). However, it should be made clear that Powers was decided in 1991, three years after the conviction of Thorson in this case. In Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the U.S. Supreme Court held that Batson applies retroactively to all cases pending on direct review. This Court has indicated that Powers also applies retroactively. See Hansen v. State, 592 So.2d 114, 127 (Miss. 1991); Bush v. State, 585 So.2d at 1267-68. That the Powers holding thus applies to Thorson is noted in order that the impression not be left that the trial judge "erred" in not applying law which was not yet in existence at the time of his ruling in this case.
That said, it remains the case that Thorson was required to raise an inference that the State used its challenges for the purpose of eliminating minority venirepersons, in order to force the State to set forth its race-neutral reasons for striking minorities. As we stated in Bush, 585 So.2d at 1267-68, applying Powers:
In essence, the first factor required by Batson has been eliminated. To establish a prima facie case of discrimination using the Batson criteria, a white defendant must show that the prosecutor has used peremptory challenges on persons of race and that the circumstances give rise to the inference that the prosecutor used the peremptory challenges in order to strike minorities.
Thus, in order to decide it is necessary to remand for a "Batson hearing," it must first be determined that the circumstances of the State's use of peremptory challenges against minority venirepersons created an inference of purposeful discrimination. The record reveals the following:
In the entire venire, there were twenty three (23) blacks and 42 whites. That is a ratio of 35% black to 64% white. The court struck 5 blacks for cause, leaving 18 blacks remaining prior to the exercise of peremptory challenges being exercised. The State used 11 of its 12 available peremptory strikes, four against whites and seven against blacks. Converting the challenges, 36% of the State's challenges were used to strike whites, 63% to strike blacks. The jury ultimately seated was composed of eight (8) whites and four (4) blacks, with two black alternates. Simple math demonstrates the empaneled jury was 66% white, 33% black, a ratio nearly exactly equal to that compromising the initial venire pool. Momentarily creating the fiction of a fourteen person jury by adding the two black alternates, the percentage of blacks on the jury rises to nearly 42%.
Based on a consideration of these statistics, and the jury ultimately empaneled, no prima facie case of purposeful discrimination appears to have been raised. The majority does not state otherwise. A similar result appears, for example, in Davis v. State, 551 So.2d 165, 170 (Miss. 1989). Therein, the defendant was black, and the jury was composed of four men, eight women, all white. The State had exercised all twelve of its peremptory challenges, seven to eliminate blacks. The trial court though requiring the State to justify its challenges "[o]ut of an abundance of caution," determined no pattern of discrimination was shown in view of the five challenges the State also used against whites. This Court affirmed. The opposite result was reached in Conerly v. State, 544 So.2d 1370 (Miss. 1989). In that case, the defendant was also black. The State used "all of the peremptory strikes necessary (five) to remove all but one black person from the jury... ." Id. at 1372. This fact was clearly enough to satisfy the requirement that an inference of racial discrimination be raised prior to the court's requiring the State to offer its reasons for exercising peremptory challenges against minority members of the venire.
I am of the opinion that the judge in Thorson's case did not err in overruling the defense's motion to have the State list the reasons for the use of each peremptory strike against a black venireperson. The trial court's decision should be upheld. Lockett v. State, 517 So.2d 1346, 1350 (Miss. 1987).
*899 In conclusion, it is "imperative that the State be required to offer a racially-neutral explanation for its peremptory challenges" only when a prima facie case is made that the State exercised its challenges to exclude venirepersons on the basis of their race. Factors such as the fact that the State did not use all of its peremptory challenges, and the fact that in the first two panels alone, at the point in the selection process when the defense raised this issue, there were thirteen blacks of which the State struck only seven, negate the possibility that a prima facie case could be established in Thorson's case. Also considering the composition of the jury selected, the facts of record convince this writer that even had the trial judge anticipated that Powers would follow, he was not required to conduct a Batson hearing as no prima facie case was made.
For all of the foregoing reasons, I do not find it necessary to remand Thorson's case for further Batson/Powers proceedings. I respectfully dissent and would affirm both the conviction and sentence of Thorson.
DAN M. LEE, P.J., and ROBERTS, J., join this opinion.
NOTES
[1] Harrison County has two judicial districts, Gulfport being in the first, and Biloxi in the second judicial district. Gloria's body was found in the first judicial district. Edgewater Mall is in the second judicial district, as is the Cedar Lake Exit on Interstate I-10 Highway.
[2] The bottle of power steering fluid was located where Thorson indicated he threw it in the woods. The wallet was never found. (R. IX, 216, 218)
[3] Paas testified Robinson took a tape recording of a telephone conversation with Isham. (R. XII, 815)
[4] At the suppression hearing, Giraud testified that he gave Thorson his Miranda warnings prior to questioning him on March 7. Tootle testified at the suppression hearing that he did not advise Thorson of his rights prior to questioning him on that date. However, at trial, Tootle testified that Miranda warnings were in fact given to Thorson prior to questioning on March 7.
[5] Rule 804(b)(3) provides:

(b)(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. (Emphasis added.)
[6] Subpoenas issued for Cook and Pelvin in Harrison County were returned "not found." (R. III, 465-66) Subpoenas were mailed to Pat Cook at Rt. 4,, 9013 Monroe Road, Clare, Michigan, and Betty Pelvin at 360 South Hardwick, Southwest Camelot Manor, Grand Rapids, Michigan. (R. III, 574-75) The subpoena mailed to Richard Isham, c/o Raymond Herzog, Jerome St., Grand Rapids, Michigan, was returned for "insufficient address." (R. IV, 628-29)
[7] Michigan has an act corresponding to Miss. Code Ann. § 99-9-27. See § 28.1023 (191), et seq. Michigan Statutes; People v. Williams, 114 Mich. App. 186, 318 N.W.2d 671 (1982); People v. Loyer, 169 Mich. App. 105, 425 N.W.2d 714 (1988).
[8] The trial court is not to be criticized for its ruling because the Powers decision was not handed down until after the trial in this case. Powers applies retroactively to cases pending on direct review. See Hansen v. State, 592 So.2d 114, 127 (Miss. 1991); Bush v. State, 585 So.2d 1262, 1267 (Miss. 1991).
[9] In Williams we held in abeyance the remaining issues on appeal pending a Batson hearing in the circuit court. The better procedure in this case was for this Court to consider all issues raised on appeal and to determine whether there was any other error requiring reversal.