# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-DP-00943-SCT

*WILLIE JEROME MANNING a/k/a "FLY"*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/1996 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARK WILLIAMSON |
| | CLIVE A. STAFFORD SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REMANDED FOR BATSON HEARING - 03/31/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On January 18, 1993, Martin Luther King, Jr. Day, at approximately 8:30 p.m., some children noticed the bodies of Emmoline Jimmerson and Alberta Jordan lying on the floor in their apartment at Brooksville Gardens in Starkville, Mississippi. Ms. Jimmerson, who was sixty years old, was the daughter of Ms. Jordan, who was ninety years old. One of the boys kicked the door open, and Nancy Elliott, Ms. Jimmerson's niece, entered the apartment to find the bodies of Ms. Jimmerson and Ms. Jordan lying in pools of blood.

¶2. The last time that witnesses were able to verify that the women were alive was around 5:30 to 5:45 p.m., when Ms. Jimmerson left Vanessa Williams's apartment, went downstairs, and spoke to Ms. Elliott on the telephone. County Medical Examiner Orville Musgrove estimated the time of death to be approximately 8:00 p.m, a conclusion disputed by Officer Stanley Sisk with the Mississippi Highway Patrol and Officer Jeff Curtis with the Starkville Police Department.

¶3. Both women had been severely beaten about the head with an iron discovered on the scene, and each

had sustained slash wounds to the front of the neck which went all the way to the backbone. Officers Sisk and Curtis investigated the crime scene. In addition to the blood-covered iron, they found a bloody kitchen knife wrapped in a curtain on a loveseat in the dining room area. There were no identifiable prints on either weapon, and the only identified print taken from the apartment belonged to Ms. Jordan. Dr. Steven Hayne, who performed the autopsies in this case, testified that the cause of death in both women was the slash wounds, which resulted in severe external bleeding and inhalation of blood. Dr. Hayne stated that the victims essentially drowned in their own blood.

¶4. Kevin Lucious testified that he saw Willie "Fly" Manning at Brooksville Gardens around 6:30 p.m. on the day of the murders. Manning was tipsy from drinking beer, and the two men had a conversation during which Manning mentioned that he needed some money. After their conversation, Lucious went back to his apartment and saw Manning go to Ms. Jimmerson and Ms. Jordan's apartment. Lucious watched Manning knock on the door, and when one of the women opened the door, he pushed the door open, went in and closed the door behind him. Lucious never saw Manning leave within the next twenty to forty-five minutes.

¶5. A couple of weeks after the murders, Lucious saw Manning at Club Essex. Manning had been drinking and said that if he'd known "they" only had twelve dollars, he wouldn't have done anything to "them." Manning's brother Marshon told him to shut up, and Manning told Marshon that he'd kill him, too. Manning then described pushing his way into the "old ladies'" apartment and said that when he went in one of them was in the living room and the other was in the back room, but came up front. Marshon told him to shut up again, which Manning did. Two or three days after the incident at Club Essex, Lucious saw Manning and Marshon at Brooksville Gardens again. Manning was waving a .25 automatic around "saying that it ain't nothing to kill somebody and you know, sometimes you have to kill people in order to get your respect that you deserve." Herbert Ashford testified that two or three weeks after the murders, he overheard Manning tell Lucious that he should have done more than he did to the ladies.

¶6. Manning gave a statement to police on March 10, 1994, in which he denied being at Brooksville Gardens on the day of the murders. He claimed that he went to town with his mother intending to march in the Martin Luther King, Jr. Day parade, but decided to go home when it started raining between 10:00 a.m. and noon. Manning also said that he had known the two old ladies since he was fourteen and did not know anyone who would want to hurt them. Manning's statement was refuted by the testimony of Kevin Lucious, Herbert Ashford, Nancy Elliott, Barbara Duck, and Larry Harris, who were all able to place Manning at Brooksville Gardens on January 18, 1993.

¶7. Manning's defense theory was that Emmoline Jimmerson's son, James Lee Jimmerson, was the actual perpetrator in this case. Jimmerson had been in an argument over the telephone with his mother on the morning of the murders. Based upon Dr. Hayne's testimony that one of the slash wounds on Ms. Jordan's neck was cut from her right to her left with a significant amount of force, the defense proposed that Jimmerson, being left-handed, was more likely to have committed the murders than Manning, who is right-handed. Defense attorney Mark Williamson's theory was that the perpetrator stood behind the victims and cut their throats as they lay on the floor. However, as the prosecutor pointed out during closing argument, Dr. Hayne was unable to determine whether the perpetrator stood behind, in front of, or to the side of the victims to slash their throats, and it would be possible for either a right-handed or left-handed person to inflict the wound in question. The defense also relied on the inconsistent statements of Shantay Lee, Jimmerson's girlfriend, regarding Jimmerson's whereabouts on the day in question. Police initially investigated Jimmerson as a suspect in the case, but found no evidence connecting him to the murders.

Everyone they interviewed confirmed Jimmerson's alibi that he was at home at the time of the murders. Eventually, the focus of the investigation shifted to Manning, who was indicted in the Circuit Court of Oktibbeha County on two counts of capital murder.

¶8. Based upon the above evidence, the jury returned a verdict of guilty on both counts of capital murder on July 24, 1996. The sentencing phase of the trial was held on July 25, 1996, and the jury voted that the death penalty should be imposed in both counts. On July 30, 1996, Circuit Court Judge John M. Montgomery entered his orders of conviction and sentence, ordering that Manning be put to death by lethal injection on September 5, 1996. Manning perfected his appeal to this Court and assigns as error the following:

**I. THE CASE MUST BE REVERSED AND RENDERED SINCE THE EVIDENCE DOES NOT EXCLUDE THE REASONABLE POSSIBILITY THAT WILLIE MANNING IS INNOCENT OF THE CRIMES.**

**II. IN A CASE THAT HINGED TOTALLY ON TWO HIGHLY QUESTIONABLE SNITCHES, THE JURY SHOULD HAVE BEEN INSTRUCTED TO VIEW THE TESTIMONY OF INFORMANTS WITH CAUTION.**

**III. WHERE WILLIE MANNING'S OTHER DEATH SENTENCE WAS COMMON KNOWLEDGE IN THE COMMUNITY, IT WAS ERROR TO REFUSE TO ALLOW THE DEFENSE TO VOIR DIRE MEANINGFULLY ON THIS CRITICAL ISSUE.**

**IV. WILLIE MANNING WAS DENIED HIS RIGHT TO EFFECTIVE COUNSEL AT THE PENALTY PHASE OF HIS TRIAL.**

**V. THE FAILURE TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION VIOLATED WILLIE MANNING'S RIGHTS.**

**VI. WILLIE MANNING WAS DENIED A FAIR TRIAL BECAUSE THE STATE ONCE AGAIN ABUSED ITS PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS IN VIOLATION OF <u>BATSON v. KENTUCKY</u>.**

**VII. THE GRUESOME PHOTOGRAPHS IN THIS CASE NOT ONLY PREJUDICED WILLIE MANNING, BUT RENDERED HIS JURY PARTIAL.**

**VIII. WITNESSES WHO TESTIFIED FOR THE STATE SHOULD NOT HAVE BEEN ALLOWED TO SPECULATE OR OFFER OPINIONS REGARDING ISSUES WITHIN THE JURY'S SOLE PREROGATIVE.**

**IX. THE TRIAL COURT ERRED IN LIMITING DEFENSE COUNSEL'S INQUIRY CONCERNING THE SCOPE OF THE POLICE INVESTIGATION INTO THIS OFFENSE.**

**X. THE PROSECUTOR'S MISCONDUCT DURING THE COURSE OF CLOSING ARGUMENT VIOLATED MANNING'S RIGHT TO A FAIR TRIAL AND WARRANTS REVERSAL.**

**XI. THE AGGRAVATING CIRCUMSTANCES IN THIS CASE WERE IMPROPERLY**

**APPLIED.**

**XII. THE SENTENCING INSTRUCTIONS INADEQUATELY INSTRUCTED THE JURY ON THE MANNER IN WHICH THEY SHOULD CONSIDER MITIGATING AND AGGRAVATING CIRCUMSTANCES.**

**XIII. THE DEFENSE WAS DENIED THE RIGHT TO MEANINGFUL INVESTIGATIVE ASSISTANCE.**

**XIV. VARIOUS MOTIONS SHOULD HAVE BEEN GRANTED PRIOR TO TRIAL.**

**XV. THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE BE SET ASIDE.**

¶9. We find no errors requiring reversal of Manning's convictions in this case. However, because the trial court erred in overruling Manning's *Batson* objection to the second venire, we must remand to the Oktibbeha County Circuit Court for the sole purpose of conducting a *Batson* hearing.

## STATEMENT OF THE LAW

## GUILT PHASE

### I.

**THE CASE MUST BE REVERSED AND RENDERED SINCE THE EVIDENCE DOES NOT EXCLUDE THE REASONABLE POSSIBILITY THAT WILLIE MANNING IS INNOCENT OF THE CRIMES.**

¶10. Manning argues that the trial court erred in denying his motions for a directed verdict, because the evidence was insufficient to support the verdict. Specifically he points to the inconsistency and lack of credibility of the State's key witnesses, Kevin Lucious and Herbert Ashford, and the lack of evidence supporting the underlying felony of robbery. Manning requests that this Court reverse his convictions and discharge him.

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*McFee v. State*, 511 So. 2d 130, 133-34 (Miss. 1987). This Court has applied the same standard of review in capital murder cases. *Underwood v. State*, 708 So. 2d 18, 34-35 (Miss. 1998); *Lester v. State*, 692 So. 2d 755, 797 (Miss. 1997), *overruled on other grounds*, *Weatherspoon v. State*, No.

97-KA-00019-SCT, 1999 WL 12828 (Miss. Jan. 14, 1999); *Taylor v. State*, 672 So. 2d 1246, 1255 (Miss. 1996); *Holly v. State*, 671 So. 2d 32, 40 (Miss. 1996); *Carr v. State*, 655 So. 2d 824, 837 (Miss. 1995).

¶11. There was sufficient evidence to support the jury's verdict in this case. Kevin Lucious testified that he saw Manning enter the victims' apartment after a 6:30 conversation during which Manning commented that he needed some money. Other witnesses were able to place Manning at Brooksville Gardens during the late afternoon and evening of January 18, 1993. Larry Harris, the last witness to see Manning at the apartments that evening, testified that he saw Manning sitting on a balcony apartment at approximately 7:20 p.m. The bodies were discovered at approximately 8:30. Finally, both Lucious and Herbert Ashford testified regarding Manning's incriminating statements in which he described how he forced his way into the victims' apartment, expressed regret for having hurt the women for so little money, and stated that "it ain't nothing to kill somebody" and that he should have done more to the old ladies. These confessions and eyewitness accounts were at least ample evidence for reasonable jurors to differ on the issue of Manning's guilt.

¶12. Manning maintains that his convictions must be overturned, because "the inconsistent testimony of two convicts was insufficient to support the verdict." "It is the duty of the jury to best judge the credibility and weight of the witnesses in court." *Hill v. State*, 659 So. 2d 547, 551 (Miss. 1994). The jury was aware that Kevin Lucious had a prior conviction for robbery and was at the time of trial charged with first degree murder, first degree assault, and two counts of armed criminal action arising out of a single incident in Missouri. Herbert Ashford similarly testified that he was currently in federal prison in Florida on a gun charge related to drug trafficking. Although Lucious admitted that he initially did not tell police what he knew about the murders, he explained in his statement and at trial that he did not come forward until his grandmother urged him to tell the truth in a letter delivered by Oktibbeha County Sheriff Dolph Bryan. He had not wanted to get involved because of his concern for his baby and his baby's mother. Moreover, the fact remains that neither Lucious nor Ashford received any leniency in exchange for their testimony at Manning's trial. Ashford was only months away from release at the time of Manning's trial. The jury was fully informed on all issues related to these two witnesses' credibility. Giving the prosecution the benefit of all favorable inferences, we find that there was substantial credible evidence to support the jury's verdict.

¶13. Manning's contention that the evidence did not support the underlying felony of robbery is also without merit. Emma Jean Harris gave Ms. Jimmerson and Ms. Jordan each a ten dollar bill on January 16. Ms. Harris testified that Ms. Jimmerson kept her money in a pocketbook, and Ms. Jordan kept her money tied in a handkerchief pinned to her bra. Two days later, when the authorities investigated the crime scene, they found a handkerchief in a puddle of blood in front of the couch. Ms. Harris identified the handkerchief as the one Ms. Jordan used to secure her money. Investigators also discovered Ms. Jimmerson's billfold and change purse underneath her mattress, which had been left crooked. No money was found in the apartment. Finally, Lucious testified that Manning commented on the small amount of money he was able to get from the women-only twelve dollars. The prosecution met its burden of proof to show that Manning killed Emmoline Jimmerson and Alberta Jordan during the commission of robbery.

## II.

### IN A CASE THAT HINGED TOTALLY ON TWO HIGHLY QUESTIONABLE SNITCHES, THE JURY SHOULD HAVE BEEN INSTRUCTED TO VIEW THE TESTIMONY OF

¶14. Judge Montgomery refused Manning's Instructions DGP-7 and DGP-8 relating to the testimony of Kevin Lucious and Herbert Ashford, because the instructions were accomplice cautionary instructions, and neither Lucious nor Ashford was an accomplice in this case. The refused instructions read, "[Herbert Ashford/Kevin Lucious] has testified in this case and his testimony is to be considered and weighed with great care and caution. In making this determination you may consider this witness' [sic] bias or interest. You may give it such weight and credit as you deem it is entitled."

¶15. Manning argues that the unreliability of these informants' testimony warranted the refused instructions. He cites *Foster v. State*, 508 So. 2d 1111, 1115 (Miss. 1987), to support his theory that careful instructions should be given to aid the jury in weighing the suspect testimony of snitches due to their bias resulting from "preferential treatment." In *Foster*, we held that questions about the details of a witness's criminal participation were improper, but "questions about preferential treatment constituted a legitimate attempt to show the witness's bias or motive in testifying." *Id*. In this case, the jury heard evidence of Lucious and Ashford's criminal records. Manning was allowed to question fully both Lucious and Ashford about any potential preferential treatment which they might be receiving in exchange for their testimony. Neither witness made any deals with law enforcement or prosecutors regarding their testimony at Manning's trial, although Ashford's letters to Captain Lindley indicated that he had initially hoped Lindley would be able to help him. This questioning satisfied the dictates of *Foster*.

¶16. No evidence was presented implicating either Lucious or Ashford in the murders of Emmoline Jimmerson and Alberta Jordan. Where, as here, the witness was not charged as an accomplice, and no evidence was presented indicating that he should have been charged, the cautionary instruction is not necessary. *Bell v. State*, No. 93-DP-00189, 1998 WL 334709, *10 (Miss. June 25, 1998). Instructions DGP-7 and DGP-8 were properly excluded.

## III.

### WHERE WILLIE MANNING'S OTHER DEATH SENTENCE WAS COMMON KNOWLEDGE IN THE COMMUNITY, IT WAS ERROR TO REFUSE TO ALLOW THE DEFENSE TO VOIR DIRE MEANINGFULLY ON THIS CRITICAL ISSUE.

### A. The Defense Was Not Able to Explore Whether Eight Jurors' Knowledge of His Prior Convictions and Death Sentences Would Truly Make it Impossible for Them to Sit Fairly in Judgment on Him.

¶17. On appeal, Manning complains that he should have been allowed to conduct individual voir dire regarding the jurors' knowledge of his previous convictions and death sentences for murdering two Mississippi State students, recently affirmed by this Court in *Manning v. State*, No. 95-DP-00066-SCT, 1998 WL 334719 (Miss. June 25, 1998) (*Manning I*), *overruled on other grounds*, *Weatherspoon v. State*, No. 97-KA-00019-SCT, 1999 WL 12828 (Miss. Jan. 14, 1999). Manning filed a pre-trial motion requesting individual sequestered voir dire based in part upon pre-trial publicity about the case. After hearing arguments from both sides at the April 21, 1995, motions hearing, Judge Montgomery decided to allow individual voir dire solely on the death qualification question. Manning argues that merely questioning the entire panel regarding whether they had heard about Manning's prior involvement in another case was insufficient to ensure that an impartial jury was impaneled in this case.

¶18. "Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court." URCCC 3.05. "[T]his is a matter within the sound discretion of the trial judge. While not requiring the use of sequestered voir dire, Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practice does, within the court's discretion, allow it, but only on good cause shown." *Bell*, 1998 WL 334709 at *5.[1]

> We do not read Rule 5.02 as prohibiting a circuit court from utilizing individualized, sequestered voir dire. In its discretion, the court may allow it. *Jones v. State*, 461 So. 2d 686, 692 (Miss.1984). We have held, however, that Rule 5.02 does not require more than by its terms it requires. *White v. State*, 532 So. 2d 1207, 1218 (Miss.1988); *Lutes v. State*, 517 So. 2d 541, 547 (Miss.1987); *West v. State*, 463 So. 2d 1048, 1054 (Miss.1985); *see Gilliard v. State*, 462 So. 2d 710, 714 (Miss.1985).

*Russell v. State*, 607 So. 2d 1107, 1110 (Miss. 1992). "Appellant's contention that he should have been allowed to individually voir dire jurors out of the presence of the others is not supported by the decisions of this Court. The procedure followed by the trial court has been repeatedly upheld." *White v. State*, 532 So. 2d 1207, 1218 (Miss. 1988) (*citing Billiot v. State*, 454 So. 2d 445 (Miss.1984); *Speagle v. State*, 390 So. 2d 990 (Miss.1980); *Gray v. State* 351 So. 2d 1342 (Miss.1977); *Peters v. State*, 314 So. 2d 724 (Miss.1975)). In both *McFarland v. State*, 707 So. 2d 166 (Miss. 1997), and *Carr v. State*, 655 So. 2d 824 (Miss. 1995), this Court approved the denial of individual sequestered voir dire where the entire venire was questioned about pretrial publicity, and those jurors who stated that they could not be fair and impartial were excused. *McFarland*, 707 So. 2d at 170; *Carr*, 655 So. 2d at 842-43.

¶19. Unfortunately, due to the highly publicized nature of Manning's first capital murder trial, it would likely have been impossible for the trial court to seat a jury of individuals who were unaware of the prior convictions, particularly in Oktibbeha County where Manning committed all four of his homicides. Here, of the twenty-eight members of the first venire who had heard about Manning's prior case, all but two stated that they would be able to set aside what they knew and be fair and impartial jurors. The other two, Juror # 20 David Jones and Juror # 35 Mildred Horton, who both stated that they had already formed an opinion regarding the case, were excused for cause. All ten of the jurors on the second venire who had heard something about Manning's involvement in another case stated that they could set aside any prior knowledge and be fair and impartial jurors. Eight of the impaneled jurors and both alternates informed the court that they had heard Manning's name in connection with another case, but assured the court that they could still be fair and impartial. It is doubtful that individual voir dire would have encouraged any of the jurors to admit that they would be partial or unfair. There is no evidence before us indicating that the jury empaneled in this case was not fair and impartial, and Manning has failed to show any prejudice resulting from the trial court's conduction of voir dire. As a result, we find that the general voir dire conducted by Judge Montgomery on the issue of pre-trial publicity was sufficient to ensure a fair and impartial jury in this case. *See Speagle*, 390 So. 2d at 993-94.

### B. The Trial Court Rushed and Hurried the Voir Dire Examination in a Manner That Is Incompatible with a Serious Case Such as This.

### C. Jurors Were Excused in Violation of Witherspoon v. Illinois.

¶20. Manning contends that Judge Montgomery needlessly rushed individual voir dire on the jurors' death

penalty views. He complains that the jurors whom he was not permitted to throughly question were, by definition, excluded in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In *Witherspoon*, the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id*. at 522 (footnote omitted). The Supreme Court clarified its *Witherspoon* decision in *Wainwright v. Witt*, 469 U.S. 412 (1985), setting out the standard for determining when it is proper to exclude a juror for cause based upon his views on the death penalty. "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (*quoting Adams v. Texas*, 448 U.S. 38, 45 (1980)).

¶21. Manning points to the court's elimination of Jurors Timothy Nalley, Julia Britt, and Ellis Bishop based upon their death penalty views. Manning failed to object to the State's motions to strike any of these jurors for cause at trial. He is therefore barred from raising their exclusion as error on appeal. *Wells v. State*, 698 So. 2d 497, 514 (Miss. 1997) ("Any claim is waived for failure to raise a contemporaneous objection.").

¶22. Aside from the procedural bar, this issue is without merit. Judge Montgomery conducted extensive questioning of all three of the jurors mentioned by Manning in his brief. After equivocating back and forth, Mr. Nalley's final words to the court were, "I am sorry to take so much of your time. I would say at this point in time, uh, that I, when it came to the sentencing phase, uh, I would probably not be able to follow the Court's instructions and would not be able to vote for the death penalty." Over the course of questioning, Ms. Britt essentially repeated that she could never vote for the death penalty unless she was 100% certain of the defendant's guilt, and that a person could never be 100% sure unless she saw the murder herself. Finally, after questioning by defense attorney Mark Williamson as to whether she could vote for the death penalty following the law if she found that the aggravating circumstances outweighed the mitigating circumstances, Ms. Britt replied, "I don't believe I could, sir." From the outset of individual voir dire, Juror Ellis Bishop was emphatic in his opposition to the death penalty based upon his religious beliefs. He unequivocally stated that he didn't believe in the death penalty and would automatically vote against the death penalty in every case. Despite Manning's assertion otherwise, Judge Montgomery did allow defense attorney Mark Williamson time to attempt to rehabilitate Juror Bishop, and Mr. Bishop still stated that he would not want to vote for the death penalty under any circumstances. These three jurors were properly excluded under the *Witherspoon*/*Wainwright* standard based upon their inability to follow the law and the court's instructions, not merely because of some general opposition to the death penalty.

¶23. Manning points to no other specific instances of improper juror removal or insufficient voir dire, and a review of the record reveals no clear error on this point. We find that Judge Montgomery's direction of voir dire was appropriate under the circumstances of this case.

## V.

## THE FAILURE TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION VIOLATED WILLIE MANNING'S RIGHTS.

¶24. This issue boils down to a dispute over whether the statements Manning made to Kevin Lucious and Herbert Ashford were direct evidence or circumstantial evidence. Judge Montgomery refused Manning's Instruction DGP-5, finding that this was a direct evidence case. Instruction DGP-5 reads as follows:

The Court instructs the jury that if the jury can deduce from the facts and circumstances surrounding the case, either from the evidence or lack of evidence, any reasonable hypothesis or theory consistent with the innocence of Willie Jerome Manning, then there is a reasonable doubt of his guilt, and the jury must return a verdict of Not Guilty.

Circumstantial evidence language was also removed from Manning's Instructions DGP-2 and DGP-3.

¶25. "Where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict."*Givens v. State*, 618 So. 2d 1313, 1318 (Miss. 1993). "A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant." *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991). "[C]ircumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to logical inference that such fact does exist. Conversely, eye witness testimony is thought of as direct evidence." *Givens*, 618 So. 2d at 1318. Direct evidence may also consist of a confession by the defendant, including the defendant's admission to a person other than a law enforcement officer. *Ladner*, 584 So. 2d at 750.

¶26. Lucious's testimony regarding Manning's description of pushing his way into the old ladies' apartment, combined with Manning's statements that if he'd known they had so little money he wouldn't have hurt them and that killing someone is nothing, amount to a confession and therefore direct evidence. *See Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985) ("There is no reason on principle why an admission by the defendant on a significant element of the offense should not also operate to render unnecessary the circumstantial evidence instruction."). Ashford's testimony that he overheard Manning tell Lucious that he should have done more to the ladies similarly equated to evidence of a confession. Moreover, Lucious was able to give an eyewitness account of Manning entering the victims' apartment, shoving his way inside. Judge Montgomery's decision to deny jury instructions on circumstantial evidence was not error.

**VI.**

**WILLIE MANNING WAS DENIED A FAIR TRIAL BECAUSE THE STATE ONCE AGAIN ABUSED ITS PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS IN VIOLATION OF <u>BATSON v. KENTUCKY</u>.**

¶27. Manning asserts that the prosecution exercised its peremptory challenges toward the elimination of blacks from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The *Batson* test involves a three-step process:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. . . .

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (citations omitted).

## A. FIRST VENIRE

¶28. Manning objected three times in the middle of jury selection to the prosecutor's use of peremptory

challenges against black members of the first venire. Rather than finishing jury selection and holding a *Batson* hearing, Judge Montgomery allowed the prosecutor to offer race-neutral reasons for his peremptory strikes as they were made, ruling on their acceptability as jury selection progressed. When the prosecution gives race-neutral reasons for its peremptory strikes, the sufficiency of the defendant's prima facie case becomes moot. *Hernandez*, 500 U.S. at 352; *Woodward v. State*, No. 95-DP-00144, 1997 WL 776557, \*5 (Miss. Dec. 18, 1997). However, because the prosecutor used nine of its eleven peremptories to strike black members of the first venire, Manning's prima facie case would be easy to prove.

¶29. The next step is to determine whether the prosecution met its burden of showing sufficient race-neutral explanations for its strikes. *Woodward*, 1997 WL 776557 at \*5. On appeal the trial court's fact-finding regarding the bases for peremptory strikes is accorded great deference, because it is largely based on credibility. *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987). "'Great deference' has been defined in the *Batson* context as insulating from appellate reversal any trial findings which are not clearly erroneous." *Id.* at 1349-50 (citations omitted). If the defendant makes no rebuttal, the trial judge may base his decision solely on the reasons given by the State. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991).

¶30. "It is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver." *Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994) (citation omitted). In this case, Manning only offered rebuttal to the prosecution's race-neutral reasons for striking Jurors Cynthia Purnell and Uyless Gray, Jr. Defense attorney Williamson disputed the prosecution's basis for striking Cynthia Purnell regarding her views on the death penalty, because the court had previously denied the State's challenge for cause against Ms. Purnell on that basis, and because she stated during individual voir dire that she could follow the law and the court's instructions. "A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause." *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995). Although the trial judge was able to sufficiently rehabilitate Ms. Purnell as a juror for purposes of denying the State's challenge for cause, her statements that she strongly disagrees with the death penalty and would be partial toward imposing a life sentence were a sufficient race-neutral basis for upholding the peremptory strike against her. Furthermore, the State's other reason for striking Ms. Purnell, her prior history of writing bad checks, has been approved by this Court as a proper race-neutral reason. *Mack*, 650 So. 2d at 1299-1300.

¶31. Manning also attempted to rebut the State's rationale for striking Uyless Gray, Jr. based upon his reluctance to be a juror. During voir dire, Mr. Gray expressed concern about being sequestered, because he was scheduled to attend annual training at Camp Shelby. Judge Montgomery assured Mr. Gray that, as the State Judge Advocate, he would be able to make arrangements for Mr. Gray to be late for training. The prosecutor also offered as a race-neutral reason his own oversight in failing to voir dire Mr. Gray about his juror questionnaire response that he was unsure of his ability to ever vote for the death penalty. Defense attorney Mark Williamson objected to the State's proffered race-neutral explanations because of the court's reassurance to Mr. Gray that his scheduled training could be worked out, and because having no opinion on the death penalty "is not one way or the other." Again, it is unnecessary for a peremptory strike to meet the same standard as a challenge for cause. *Stewart*, 662 So. 2d at 558. While the trial court had no reason to excuse Mr. Gray due to his scheduled training at Camp Shelby, the prosecutor may still have had a lingering doubt as to Mr. Gray's willingness to serve on the jury. A juror's reluctance to serve or preoccupation with matters outside the courtroom is a valid race-neutral reason for purposes of *Batson*. *Walker v. State*, 671 So. 2d 581, 627-28 (Miss. 1995). Furthermore, while it is true that having no

opinion about the death penalty may not be a legitimate justification, having doubts as to one's ability to follow the law and vote for the death penalty when appropriate is a sufficient race-neutral reason. *Johnson v. State*, 529 So. 2d 577, 584-85 (Miss. 1988). As the State points out in its brief, there is nothing in the record to support Manning's assertion that the prosecutor purposely declined to voir dire Mr. Gray on his death penalty views so that he might strike him. Manning also argues that the prosecution's disparate treatment in failing to strike white jurors who were unsure about the death penalty supports his theory of discrimination. However, as previously discussed, the State was able to articulate an additional race-neutral reason regarding Mr. Gray's unwillingness to serve on the jury, and the prosecutor exercised peremptory strikes against two white jurors based upon their death penalty views. Manning's theory of disparate treatment, therefore, must fail. *See Woodward*, 1997 WL 776557 at *7; *Mack*, 650 So. 2d at 1298. Manning has failed to meet the clearly erroneous standard required for reversal on this issue.

¶32. Manning waived discussion of the other allegedly discriminatory strikes on the first venire by failing to argue pretext at trial. *Mack*, 650 So. 2d at 1297. However, a brief examination of our prior rulings on the legitimacy of race-neutral *Batson* explanations reveals that Judge Montgomery properly held that the justifications offered by the prosecution for its strikes were all sufficient to survive Manning's *Batson* objection. The prosecution struck Juror #32, Jerry Devon Brown, based upon his lack of employment, his previous convictions for DUI and public drunk, his arrest for simple assault, and his cousin's murder conviction. Similarly, Juror #8, Yolanda Lawrence, was struck, because of her previous conviction for shoplifting. This Court has recognized unemployment as a race-neutral reason and sufficient basis for a peremptory strike. *Woodward*, 1997 WL 776557 at *6. In *Foster v. State*, 639 So. 2d 1263, 1279-80 (Miss. 1994), we also approved a juror's prior conviction as a proper race-neutral reason. The prosecutor struck Juror #15, Gloria Sherrod, based upon her acquaintance with Manning's mother. We have condoned a peremptory challenge against a juror who was acquainted with the defendant's family. *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993). Juror #21, Lena Smith, was struck by the State, because Manning's attorney, Mark Williamson, previously represented a member of her family. Connection with the defense attorney is a "*Batson*-conforming explanation" for a peremptory strike. *Chisolm v. State*, 529 630, 632-33 (Miss. 1988. We have also recognized that a juror's equivocating or anti-death penalty views establish a race-neutral reason, justifying the State's reason for striking Juror #2, Marty G. Price, Juror #39, Fredrick Akins, Juror #42, Dewitt C. Carmichael, Jr., Juror #45, Lachanjo Scales, and Juror #50, Carla Jones. *Underwood*, 708 So. 2d at 28; *Foster*, 639 So. 2d at 1279-80; *Davis v. State*, 551 So. 2d 165, 171 (Miss.1989), *vacated on other grounds*, 655 So. 2d 864 (Miss. 1995). Based upon current case law, we hold that Judge Montgomery's decision to allow the State's peremptory strikes on the first venire was not clearly erroneous.

## B. SECOND VENIRE

¶33. Although Manning did not object to any specific strikes made by the prosecutor during voir dire of the second venire, he entered an objection based upon the racial composition of the jury at the close of jury selection, which was overruled by Judge Montgomery without a hearing. The State argues that Manning's objection to the racial make-up of the jury was not equivalent to a *Batson* challenge. Since *Batson* proscribes purposeful racial discrimination and not "mere *incidental* exclusion of blacks from a jury," *Govan v. State*, 591 So. 2d 428, 430 (Miss. 1991) (emphasis in original), the State maintains that Judge Montgomery was correct in summarily overruling Manning's objection to the racial composition of the jury. However, where the grounds for objection are apparent from the context, we have held the error preserved for appeal. *See Barnette v. State*, 478 So. 2d 800, 803 (Miss. 1985). Manning's objection to the racial

composition of the jury was sufficiently clear to require a ***Batson*** hearing in this case.

¶34. Unlike the process followed in the first venire, the State did not offer race-neutral reasons for the two peremptory strikes used in the second venire. Judge Montgomery erred in failing to require the State to articulate sufficient race-neutral reasons for its strikes on members of the second venire. Such failure to follow the proper procedure required after a ***Batson*** challenge requires reversal for a ***Batson*** hearing. ***Batson***, 476 U.S. at 100; ***Berry v. State***, 703 So. 2d 269, 295 (Miss. 1997); ***Thorson v. State***, 653 So. 2d 876, 896 (Miss. 1994); ***Bush***, 585 So. 2d at 1268; ***Baskins v. State***, 528 So. 2d 1120, 1122 (Miss. 1988); ***Abram v. State***, 523 So. 2d 1018, 1019 (Miss. 1988); ***Dedeaux v. State***, 519 So. 2d 886, 891 (Miss. 1988); ***Joseph v. State***, 516 So. 2d 505 (Miss. 1987); ***Harper v. State***, 510 So. 2d 530, 532 (Miss. 1987); ***Williams v. State***, 507 So. 2d 50, 53-54 (Miss. 1987). Following these cases, we remand this case for the trial court to conduct a ***Batson*** hearing, at which the State will be allowed to offer any race-neutral reasons for its peremptory strikes on members of the second venire, and Manning will be afforded an opportunity to rebut those reasons.

## VII.

### THE GRUESOME PHOTOGRAPHS IN THIS CASE NOT ONLY PREJUDICED WILLIE MANNING, BUT RENDERED HIS JURY PARTIAL.

¶35. Manning takes issue with the admission of the victim photographs in this case. He contends that the prosecution should have used black and white copies rather than color photographs, but cites no Mississippi authority to support his position. "The fact that the pictures in this case were color slides does not alter the rule. If they have probative value they are admissible under the same circumstances and conditions as are black and white photographs." ***Kelly v. State***, 278 So. 2d 400, 402 (Miss.1973). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid. 403. "[P]hotographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." ***Mackbee v. State***, 575 So. 2d 16, 31 (Miss. 1990) (*quoting **McNeal v. State***, 551 So. 2d 151, 159 (Miss. 1989) (*quoting **McFee***, 511 So. 2d at 135).

> When deciding on the admissibility of gruesome photos, trial judges must consider: "(1) whether the proof is absolute or in doubt as to identity of the guilty party, [and] (2) whether the photos are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury."

***Holland v. State***, 587 So. 2d 848, 864 (Miss.1991) (*quoting **McNeal***, 551 So. 2d at 159). The decision of whether to admit photographs is within the sound discretion of the trial court. ***Mackbee***, 575 So. 2d at 31.

¶36. Although bloody, the close-up photographs of the victims in this case, as depicted in Exhibits S-16 and S-17, cannot be said to be so grotesque as to require reversal. Exhibit S-17 shows the body of Emmoline Jimmerson, face down with her head surrounded by a pool of blood, revealing her bruised right ear, but with neither the knife wound nor her face visible. The photograph of Alberta Jordan, in Exhibit S-16, is arguably the most gruesome, because it partially depicts the knife wound to her throat with the left side of her bruised face visible. However, compared to other photographs which we have found admissible,

Exhibits S-16 and S-17 are relatively mild. Judge Montgomery found that the photographs were probative in that they depicted the victims' wounds. The other three photographs of the victims' bodies are from a more distant vantage point and contain very little blood, with no wounds visible and the victims' heads mostly covered. Manning offered no objection to the introduction of these three photographs, and is therefore procedurally barred from raising their admission as error on appeal. *Walker v. State*, 671 So. 2d 581, 600 (Miss. 1995). Based upon this Court's history of allowing great leniency in the admission of victim photographs, we find no error in their admission in this case.

¶37. Manning also contends that admission of the victim photographs was particularly prejudicial in this case because of the admitted sensitivities of four of the venire members. Jurors Lorelei Morgan, Rebecca Oden, Emma Chandler, and Candace McGee all expressed concern for their ability to cope with the gory details of the case and remain impartial rather than be swayed by sympathy. However, upon further instruction from Judge Montgomery on the jury's duty to set aside sympathy for the victims and their families "[a]s far as humanly possible" and to "decide the case on the facts and the law," each of these jurors assured the court that they would be able to follow the court's instructions. Manning's argument on this point is without merit.

## VIII.

## WITNESSES WHO TESTIFIED FOR THE STATE SHOULD NOT HAVE BEEN ALLOWED TO SPECULATE OR OFFER OPINIONS REGARDING ISSUES WITHIN THE JURY'S SOLE PREROGATIVE.

¶38. During his direct examination of Starkville Police Captain David Lindley, Manning attempted to prove that Lindley's initial theory was that James Lee Jimmerson committed the murders, based upon Jimmerson's alleged knowledge that an iron was used in the murders before that fact was released to the public, the lack of ransacking in the apartment, and the fact that his mother, Emmoline Jimmerson, received the more brutal beating. During cross-examination, the prosecutor questioned Lindley about the extensiveness of the investigation of Jimmerson, without any objection by Manning. Lindley testified that the investigation of Jimmerson was "the most thorough set of interviews we have ever conducted of any suspect that I have ever witnessed, know about or experienced" in his 17 years as a detective. He also stated that Jimmerson fully cooperated with the authorities and that, although Jimmerson lied on some points, his alibi checked out. Without objection by Manning, Lindley then answered that although he initially held the opinion that Jimmerson was guilty of the murders, he no longer held that opinion. Manning only objected to the prosecutor's question, "And you changed that opinion after had [sic] talked with Herbert Ashford and Kevin Lucious?" at which point the prosecutor withdrew the question.

¶39. Manning maintains on appeal that this line of testimony was inadmissible. Because Manning failed to make a contemporaneous objection to Lindley's testimony, he is procedurally barred from raising this argument on appeal. *Lester*, 692 So. 2d at 770. Aside from the procedural bar, this issue is without merit. Manning points to *Smith v. State*, 499 So. 2d 750 (Miss. 1986), as authority on the erroneous introduction of incompetent, inflammatory evidence. In *Smith*, the prosecutor attempted to introduce evidence that the defendant killed his "wife" to prove his motive of jealousy and revenge for killing the victim in the case. *Id*. at 756. We reversed, finding that the evidence was unnecessary to prove motive, was overly inflammatory, and therefore was inadmissible. *Id*. at 756-57. Here, the prosecution was not attempting to elicit testimony of extraneous, prejudicial evidence. Lindley did not improperly testify that he

believed Manning was guilty. *See Alexander v. State*, 610 So. 2d 320, 334 (Miss. 1992). The prosecutor's questioning was proper rebuttal to the defense theory that Jimmerson was the actual perpetrator.

## IX.

## THE TRIAL COURT ERRED IN LIMITING DEFENSE COUNSEL'S INQUIRY CONCERNING THE SCOPE OF THE POLICE INVESTIGATION INTO THIS OFFENSE.

¶40. During Manning's direct examination of Lindley, the following exchange took place:

> Q. Captain Lindley, other than Tyrone Smith, did your investigation turn up anyone else that, uh, th at was, uh, confessing to the crime?
>
> BY MR. ALLGOOD: If your Honor please, it would be both irrelevant and it would be hearsay and I would object to that.
>
> BY THE COURT: The objection, uh, will be sustained.

Manning asserts that the trial court erred in sustaining the prosecutor's objection, because the evidence would not have been hearsay since it was not offered to show the truth of the matter asserted. Instead he claims that he was attempting to show that police targeted Manning to the exclusion of other legitimate suspects. Manning's theory is that several people in the community claimed responsibility for the double homicide, lessening the credibility of all of the alleged confessions, including his own.

¶41. Manning cites no authority for his position that Lindley's testimony regarding other confessions uncovered during the investigation was admissible. As a result, we need not address the merits of this assignment of error. *De la Beckwith v. State*, 707 So. 2d 547, 597 (Miss. 1997).

¶42. Without waiving Manning's burden to cite supporting authority, we proceed to a discussion of the merits. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801(c). Hearsay is generally inadmissible unless it falls under a recognized exception. Miss. R. Evid. 802. The State argues that Lindley's testimony would have been hearsay, because Manning attempted to prove the truth of the matter asserted-that other people confessed to the crime. This is a misinterpretation of the hearsay issue presented here. Lindley's testimony would only be hearsay if offered to prove the truth of the matter asserted-the truth of the other confessions. Manning should have been allowed to question Lindley regarding other known confessions in the case, but only to prove that there were other viable suspects. However, because Manning failed to assert this position at trial, we refuse to hold Judge Montgomery in error for sustaining the State's objection. It was reasonable for the trial court to assume that Manning was attempting to prove through Lindley's testimony that one of the other confessors committed the murders. The testimony would in that situation be inadmissible based upon the hearsay rule. Manning waived his argument by failing to present it to the court at the time of the objection. *See Chase v. State*, 645 So. 2d 829, 846 (Miss. 1994) ("A trial court cannot be put in error on a matter not presented to the court for decision.").

¶43. Moreover, no prejudice resulted from the trial court's ruling, because Manning was able to put on evidence of the confessions and other suspects by questioning witnesses other than Lindley. Manning examined Tyrone Smith about his and another individual's confessions and called key suspect James Lee

Jimmerson as a witness. Manning also elicited testimony from Kevin Lucious on cross-examination, without objection from the State, that Tyrone Smith had confessed to killing the two women. Manning's case was not prejudiced by the exclusion of Lindley's testimony related to other confessions in this case.

## X.

## THE PROSECUTOR'S MISCONDUCT DURING THE COURSE OF CLOSING ARGUMENT VIOLATED MANNING'S RIGHT TO A FAIR TRIAL AND WARRANTS REVERSAL.

¶44. Manning contends that the prosecutor made improper closing argument by vouching for the credibility of witnesses and misrepresenting the evidence. The record reflects that Manning failed to offer a contemporaneous objection to any of the complained-of comments at trial, so he is procedurally barred from raising this issue on appeal. *Wells*, 698 So. 2d at 514. Furthermore, Manning's claims are not supported by the record.

¶45. "[A]n advocate does not vouch for the evidence submitted in a cause; the tribunal is responsible for assessing its probative value." Mississippi Rules of Professional Conduct Rule 3.3, cmt. We have previously condemned personal vouching of witnesses by the prosecution. *See Bell v. State*, 93-DP-00189, 1998 WL 334709, *14 (Miss. June 25, 1998). We have also warned prosecutors of the danger of reversal when they go outside the scope of the record during closing argument. *Wideman v. State*, 339 So. 2d 1378, 1382 (Miss. 1976).

¶46. Manning asserts that Mr. Allgood misrepresented Barbara Duck's testimony when he argued that Ms. Duck saw Manning around the crime scene at 6:20 p.m. In fact, Ms. Duck stated that the last time she saw Manning on the evening of the murders was around 4:00 p.m. when she left for Rock Hill. Manning argues that this misstatement of the facts was important, because Ms. Duck's testimony was used to impeach Manning's statement that he had not been at Brooksville Gardens on the evening of the murders. This argument fails on a common sense analysis. In Manning's statement to police, he claimed that he was not at Brooksville Gardens on the day or night of the murders. Ms. Duck's testimony impeaches Manning's statement whether she saw him at 4:00 p.m. or at 6:20 p.m.-either way she disputes Manning's contention that he was not there. Although Manning does not make the argument in his brief, the prosecutor's misstatement of Ms. Duck's testimony could be prejudicial to Manning's case if his intent was to place Manning at the crime scene closer to the approximate time of the murders. However, even if this were true, the State provided several other witnesses who saw Manning at Brooksville Gardens at different times on the day of the murders, between 3:00 p.m. and 7:20 p.m. Any resulting prejudice therefore fades in light of the tremendous amount of testimony placing Manning at the murder scene.

¶47. Manning also takes issue with the prosecutor's statement that Kevin Lucious would never be rewarded for his testimony. He maintains that this was a misstatement of the testimony, because Lucious only stated that he had not yet received any leniency in exchange for his participation. Manning's position simply is not supported by the record. Lucious attested that he had not made any deals with law enforcement or the prosecution to testify at Manning's trial. The prosecutor's comments on his lack of incentive for testifying, therefore, were within the wide range of acceptable argument.

¶48. Manning also asserts that the prosecutor misstated the evidence when he spoke of an eyewitness to the murders. The prosecutor never specifically argued that Lucious witnessed Manning murder the two women. The prosecutor called him an eyewitness, and Lucious was an eyewitness to Manning's forced

entry into the victims' apartment. Again, the portions of closing argument of which Manning complains are not outside the scope of allowable argument.

¶49. Finally, Manning contends that the prosecutor improperly argued that Manning was an evil person bent on criminality. The prosecutor's exact language was, "And Willie Manning has got brothers. One that he is trying to school in the fine art of killing people." This comment was related to Manning's conversation with his brother Marshon and Kevin Lucious at Club Essex, during which Manning stated that "it ain't nothing to kill somebody and you know, sometimes you have to kill people in order to get your respect that you deserve." In Lucious's statement to police, he depicted the conversation as "in general about Fly saying you had to kill people to get respect. Fly was trying to convince Marshon to be able to kill somebody." The prosecutor's comment that Manning was teaching Marshon about killing people was therefore based in the evidence.

¶50. Trial counsel is granted wide latitude during closing argument. *Johnson v. State*, 416 So. 2d 383, 391-92 (Miss. 1982). "[T]he court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence." *Id*. at 391 (*quoting Gray v. State*, 351 So. 2d 1342, 1346 (Miss. 1997) (*quoting Nelms & Blum Co. v. Fink*, 159 Miss. 372, 130 So. 817, 820 (1930)). "To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.''" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (*quoting United States v. Bagley*, 473 U.S. 667, 676 (1985) (*quoting United States v. Agurs*, 427 U.S. 97, 108 (1976)). The prosecutor's closing argument in this case does not require reversal.

## XIII.

## THE DEFENSE WAS DENIED THE RIGHT TO MEANINGFUL INVESTIGATIVE ASSISTANCE.

¶51. Manning complains that the $1,000 granted by the trial court for him to hire a criminal investigator was insufficient and a violation of due process. In *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), we discussed the use of State funds to pay for investigative assistance for an indigent defendant:

> We recognized that there may be instances, when in fairness, the state should be required to provide and pay for non-legal personnel needed by the defense, and we committed to the circuit court the discretionary authority to identify such cases and make such orders as may be appropriate. *Billiot v. State*, 454 So. 2d 445, 453-54 (Miss.1984); *Ruffin v. State*, 447 So. 2d 113, 118 (Miss.1984); *Bullock v. State*, 391 So. 2d 601, 607 (Miss.1980).

> The Supreme Court broadened these premises with *Ake* [*v. Oklahoma*, 470 U.S. 68 (1985)] in 1985. Still, in the same term, the Court reiterated that the Constitution does not require the state to furnish an investigator absent a showing of substantial need. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *see also*, *Johnson v. State*, 529 So. 2d 577, 589 (Miss.1988). The accused is required to offer concrete reasons for requiring such assistance, not "undeveloped assertions that the requested assistance would be beneficial. . . ." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231, 236 n. 1 (1985). . . .

*Hansen*, 592 So. 2d at 125.

¶52. Here, Manning filed a motion for funds to hire a criminal investigator, Hubert Chandler, which was granted by Judge Montgomery in an order dated May 30, 1995. In sustaining the motion, Judge Montgomery informed Manning at the April 21, 1995, motions hearing that he would authorize $1,000 for hiring Mr. Chandler with the agreement that if extra funds were needed, Manning could file a motion to that effect. In Manning's February 20, 1996, motion for compensation of his investigator, the itemized expense list totaled $771.75, the same amount granted in the February 23, 1996, order sustaining the motion. The trial court granted Manning every request he made for funds to hire a private investigator. It therefore cannot be said that he was denied any right to meaningful investigative assistance.

## XIV.

## VARIOUS MOTIONS SHOULD HAVE BEEN GRANTED PRIOR TO TRIAL.

¶53. Manning claims that the trial court erred in allowing the State to discriminate against working class jurors through the exercise of challenges for cause and refusing to provide funds for those otherwise unable to serve on the jury. As a result, he contends that he was denied his right to an impartial jury drawn from a fair cross-section of the community. Manning specifically points to the court's excusing Juror #62 Martha Carr based upon hardship, because she had no transportation and needed her paycheck from work. Manning informed the court that he had no objection to excusing Ms. Carr for cause, and is therefore barred from raising this issue on appeal. *Chase*, 645 So. 2d at 844. As for Manning's argument that the trial court's refusal to provide funds for those otherwise unable to serve denied him an impartial jury, we rejected the same argument in ***Manning I***. *Manning I*, 1998 WL 334719 at *41, *overruled on other grounds*, *Weatherspoon v. State*, No. 97-KA-00019-SCT, 1999 WL 12828, *9-10 (Miss. Jan. 14, 1999)*). This issue is also barred since Manning failed to object to the jury composition on that basis. *Id*.

¶54. Manning also complains about the release of Juror #38 Dora Ann Clayborn, based in part upon her inability to read and write. State statutory law requires that an individual be able to read and write to be a competent juror. Miss. Code Ann. § 13-5-1 (1972). We have held that the literacy requirement does not violate the Constitution. ***Turner v. State***, 573 So. 2d 657, 666 (Miss. 1990). Furthermore, Manning offered no objection to the State's challenge of Ms. Clayborn. This issue is both procedurally barred and without merit. *Chase*, 645 So. 2d at 844.

## <u>SENTENCING PHASE</u>

## IV.

## WILLIE MANNING WAS DENIED HIS RIGHT TO EFFECTIVE COUNSEL AT THE PENALTY PHASE OF HIS TRIAL.

¶55. Manning argues that his trial attorney, Richard Burdine exhibited ineffective assistance of counsel during the penalty phase of trial by failing to investigate and prepare adequately. Manning specifically points to the brevity of Mr. Burdine's opening statement, his failure to object to a question posed by the prosecutor to defense witness Dorothy Bishop, Burdine's statements during closing argument that he "trusted the spirit" in questioning Manning's mother, and statements during closing argument regarding appellate review of death penalty cases.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first prong requires the defendant to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (*quoting* *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To satisfy the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id*. at 695.

¶56. "[T]he decision to make an opening statement is 'a strategic one.'" *Cabello v. State*, 524 So. 2d 313, 318 (Miss.1988) (*quoting* *Gilliard v. State*, 462 So. 2d 710, 716 (Miss. 1985)). Mr. Burdine's opening statement here, consisting of eight lines, did not prejudice Manning in such a way as to require reversal.

¶57. On cross-examination, the prosecutor asked defense witness Dorothy Bishop, "If somebody had killed your mother and your grandmother and beat them and cut their throats and left them lying on the floor of their apartment, would you have felt like they deserved the death penalty?" Ms. Bishop responded, "If I knew for sure." Manning contends that this testimony was inadmissible and that Mr. Burdine's failure to object amounts to ineffective assistance of counsel. He cites *Payne v. Tennessee*, 501 U.S. 808 (1991), in support of his position. In *Payne*, the U.S. Supreme Court held that the Eighth Amendment does not per se prohibit the use of victim impact testimony or argument, overruling its previous decisions in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989). *Payne*, 501 U.S. at 827-30. Manning's reliance on *Payne* is misplaced, because the testimony in question here was not victim impact testimony. On direct examination, Ms. Bishop urged the jury to be merciful and spare Manning's life. The prosecutor's question posed to Ms. Bishop regarding her opinion on the appropriate punishment was proper rebuttal, so Mr. Burdine did not err in failing to object. *See* *Lester*, 692 So. 2d at 780 (defendant opened the door to subject on cross-examination through witness's testimony on direct); *Foster v. State*, 687 So. 2d 1124, 1139-40 (Miss. 1996) (failure to object when there has been no error does not constitute ineffective assistance).

¶58. One of the themes of Mr. Burdine's closing argument was mercy and the invocation of religious principles. He urged the jury to "follow the law of the spirit" and sentence Manning to life imprisonment instead of death. Apparently, part of his strategy was to show the jury how he, too, followed the spirit by asking Manning's mother whether Manning could stand the sight of blood. Mr. Burdine told the jury that he

did not prepare her and did not know what her answer to the question would be, but proceeded because the spirit moved him to ask her. Manning characterizes the statements as an admission by Mr. Burdine of his failure to adequately prepare or investigate. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, Mr. Burdine was attempting to impress the jury with his genuineness and show them that the defense witnesses were honest and not "prepped" or contrived. Without any further evidence of failure to properly investigate or interview witnesses, we will not reverse based upon this assignment of error.

¶59. Manning makes much ado about Mr. Burdine's closing statements regarding the attorney's previous cases in which death-row inmates eventually were released. Manning asserts that such comments on the appellate process are impermissible, because they lead the jury to believe that their role is minimized, making the decision to impose the death penalty less weighty. Manning points to *Caldwell v. Mississippi*, 472 U.S. 320 (1985), in which the U.S. Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29 (prosecutor's comment that the jury's decision was reviewable by the Supreme Court, and not final, required reversal). The particular excerpt of Mr. Burdine's argument to which Manning points reads, "Ladies and gentlemen of the jury, I have participated in several capital murder cases. One or two of them have been given the death penalty but the ultimate decision have [sic] not been made by the federal courts. Some of them were freed." Mr. Burdine's statement does not give the impression that an appellate court rather than the jury will ultimately decide the defendant's fate. His statement was that the federal courts did *not* make the ultimate decision. Furthermore, reading Mr. Burdine's closing argument in its entirety, it becomes clear that the comments were part of his argument that the jury should consider residual doubt in its sentencing deliberations. His point was that they should take their responsibility seriously, reminding them of those convicted and later found innocent. In context, the comments did not minimize the jury's role, but instead emphasized its importance.

¶60. Mr. Burdine's argument for mercy and consideration of residual doubt was a sound strategy here. Making religious references, Mr. Burdine appealed to the jury's humanity. Considering the brutality of the murders in this case and the aggravating circumstance of Manning's two prior convictions for capital murder, placing additional witnesses on the stand subject to cross-examination could have opened the door to more incriminating rather than mitigating testimony. *See DeLuna v. Lynaugh*, 873 F.2d 757, 759 (5th Cir. 1989) (jury's full knowledge of the brutal crime and the defendant's criminal record made counsel's decision to make a plea for a life sentence rather than offering mitigating testimony acceptable). Furthermore, because the prosecutor made a sixteen-line opening statement and called no witnesses during the sentencing phase, Mr. Burdine's decision to be brief was likely a solid strategy. Manning has failed to show that Mr. Burdine's performance was so substandard as to prejudice his case to the point of requiring reversal.

## XI.

## THE AGGRAVATING CIRCUMSTANCES IN THIS CASE WERE IMPROPERLY APPLIED.

¶61. Manning's position is that none of the aggravating factors found by the jury were valid in this case. The State in part argues that Manning is barred from raising this issue on appeal, because he failed to object to the form of the verdict sentencing instruction containing the aggravating circumstances. However, because

this Court is required by statute to review the sufficiency of the evidence supporting the jury's finding of aggravating circumstances, there can be no procedural bar here. Miss. Code Ann. § 99-19-105(3) (Rev. 1994 & Supp. 1998); *see also **Underwood**, 708 So. 2d at 39.*

### A. The Especially Heinous, Atrocious or Cruel Circumstance

¶62. Manning contends that the especially heinous, atrocious, and cruel (HAC) aggravating circumstance was both unsupported by the evidence and insufficiently defined. Instruction SSP-5 defining the HAC aggravator reads, "The Court instructs the Jury that the term 'especially heinous, atrocious and cruel' as used in these instructions is defined as being a conscienceless and pitiless crime which is unnecessarily torturous to the victim." This exact limiting instruction was previously approved by this Court as a proper instruction on the HAC aggravator in ***Lockett v. State***, 614 So. 2d 888, 896 (Miss. 1992). Manning's argument that the instruction was unconstitutionally vague is without merit.

¶63. Manning attempts to compare his case to numerous cases from other jurisdictions in which appellate courts reversed findings of the HAC aggravator where the victims were killed by multiple gunshot wounds. *See **McKinney v. State***, 579 So. 2d 80, 84 (Fla. 1991) (murder by shooting victim is not heinous, atrocious, and cruel unless set apart from other murders by additional torture); ***Hatcher v. State***, 379 S.E.2d 775, 778 (Ga. 1989) (murder committed by shooting victim twice in the head did not support finding that killing was "outrageously or wantonly vile, horrible or inhuman in that it involved torture and depravity of mind"); ***Commonwealth v. Brode***, 564 A.2d 1254, 1257-58 (Pa. 1989) (torturous aggravator not supported merely by finding that victim suffered pain before death); ***State v. Wilson***, 467 So. 2d 503, 521-22 (La. 1985) (murder by point-blank gunshot wound to the face with sawed-off shotgun did not support finding of HAC aggravating circumstance). These cases are neither controlling, nor persuasive here in a case involving severe beatings and throat slashings of two victims.

¶64. Manning asserts that there was no evidence that either victim in this case suffered extended or torturous suffering before losing consciousness. His position simply is not supported by the evidence. Both victims sustained severe beatings about the head and face before having their throats viciously slashed to the backbone. The blows to the women's heads were brutal enough to cause bleeding under the scalp and inside the skull. Ms. Jordan endured multiple bruises to the brain, and Ms. Jimmerson suffered bleeding within the brain. Dr. Hayne testified that the throat slashings would have occurred ten minutes or more after the head beatings. Ms. Jimmerson additionally sustained defensive posturing blows to her left arm and injuries to her torso consistent with being stomped, resulting in fractured ribs, bruised lungs, abdominal bleeding, and bruising and tearing in her liver and spleen. Although Dr. Hayne testified that the head wounds would likely have rendered the victims unconscious, he did not specify how long it would have taken for them to lose consciousness. He also testified that both women would have endured laborious breathing after the beatings and before the throat slashings. "The number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged" may all be considered as evidence supporting a jury's finding of the HAC aggravator. ***Davis v. State**, 684 So. 2d 643, 662 (Miss. 1996)*. Furthermore, we have rejected the notion that the victim's "ability to remain conscious" after sustaining the lethal wounds has any relevance to the issue. ***Underwood**, 708 So. 2d at 39*. The HAC aggravator was both properly presented to the jury and sufficiently supported by the evidence in this case.

### B. The "Avoid Lawful Arrest" Circumstance

¶65. Manning similarly argues that the "avoid lawful arrest" aggravating circumstance was completely

unsupported by the evidence in this case and that the jury was not sufficiently instructed on the circumstance. The jury was not separately instructed on the aggravating circumstance that "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." The aggravator was simply included on the form of the verdict instructions presented to the jury. Manning cites no authority to support his position that this aggravator should not be presented to the jury without an instruction on its narrow application. We find that the "avoid lawful arrest" aggravator is clear and requires no limiting instruction.

¶66. Manning's contention that the aggravator was improperly applied in his case is also without merit.

>The standard for reviewing the sufficiency of the evidence to support an "avoiding lawful arrest" instruction is well-settled:

>[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

>Under this construction the Court properly submits this aggravator to the jury if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.

*Woodward v. State*, No. 95-DP-00144-SCT, 1997 WL 776557, *20 (Miss. Dec. 18, 1997) (*quoting Carr*, 655 So. 2d at 853-54). "[J]urors are entitled to make the logical connection between the injuries suffered and finding an inference that the defendant murdered his victim to avoid arrest." *Holland v. State*, 705 So. 2d 307, 355 (Miss. 1997). The defendant's efforts to avoid arrest after the murder may also be considered in connection with this aggravator. *Id*. at 355-56. Manning lied to police about his presence at Brooksville Gardens on the day of the murders, presumably in order to avoid arrest. There was ample evidence that Ms. Jimmerson and Ms. Jordan knew Manning, including Manning's own statement to police in which he admitted that he had known the women since he was about fourteen years old and did not know anyone who would want to hurt them. There was no need for Manning to kill the two elderly women to fulfill his purpose of robbing them after beating them unconscious. It was therefore reasonable for the jury to find that a substantial reason for slashing their throats to ensure death was to prevent them from informing police who robbed them, thereby avoiding arrest. The "avoid lawful arrest" aggravating circumstance was properly submitted to the jury.

### C. The Robbery Aggravating Circumstance

¶67. Manning also argues the insufficiency of the robbery aggravating circumstance, both for lack of evidence to support it and the unconstitutionality of using the underlying felony in a capital murder as an aggravating circumstance. As previously discussed in Issue I, the jury had ample evidence before it to find that Manning robbed Ms. Jimmerson and Ms. Jordan. Furthermore, as Manning concedes in his brief, his argument regarding the constitutionality of this aggravator has repeatedly been rejected by this Court, *Evans v. State*, Nos. 93-DP-01173-SCT and 94-CA-00176-SCT, 1997 WL 562044, *90-91 (Miss. Sept. 11, 1997); *Williams*, 684 So. 2d at 1188-91; *Holly v. State*, 671 So. 2d 32, 39-40 (Miss. 1996), and the process has been approved by the United States Supreme Court. *Lowenfield v. Phelps*, 484 U.S. 231, 241-46 (1988).

**D. The Prior Convictions**

¶68. Manning asserts that use of his prior capital murder convictions as an aggravating circumstance was improper, based upon the unconstitutionality of those convictions as set out in his briefs before this Court in that appeal. We take this opportunity to caution prosecutors against using a prior conviction still pending on appeal as an aggravating circumstance, because it places unnecessary risk on the validity of the current conviction should the prior conviction be reversed by this Court. Here, Manning's convictions and sentences in the double homicide of the Mississippi State students were affirmed by this Court in *Manning I*, although a portion of that opinion was recently overruled in *Weatherspoon*, 1999 WL 12828 at *9-10. Because we rejected Manning's argument that the convictions in *Manning I* were unconstitutional, we must overrule this assignment of error.

**XII.**

**THE SENTENCING INSTRUCTIONS INADEQUATELY INSTRUCTED THE JURY ON THE MANNER IN WHICH THEY SHOULD CONSIDER MITIGATING AND AGGRAVATING CIRCUMSTANCES.**

¶69. Manning purports that the jury was not properly instructed on the process of weighing the aggravating and mitigating circumstances in this case, because the instructions did not inform the jury of the prosecution's burden of proving aggravating circumstances beyond a reasonable doubt, did not inform the jury that they could sentence Manning to life even without mitigating factors, and failed to provide examples of non-statutory mitigating factors. As discussed below, the record disproves all of Manning's claims.

¶70. Instructions SSP-4B and SSP-6, the forms of the verdict instructions for each count, informed the jury of the beyond a reasonable doubt burden for proving the existence of aggravating circumstances. Instruction DSP-3 also informed the jury that Manning was presumed innocent of any aggravating circumstances and restated the beyond a reasonable doubt standard.

¶71. Although the jury instructions did not specifically state that the jury could sentence Manning to life even if they found no mitigating circumstances, the instructions thoroughly covered the weighing process under which the jury must unanimously find that the aggravating circumstances outweigh the mitigating circumstances before finding that the death penalty should be imposed. The jury was informed "that the prosecution carries the burden of showing not only that aggravating circumstances exist but also that they are sufficient enough to warrant death" and that the existence of an aggravating circumstance does not require automatic imposition of the death penalty. Manning's Instruction DSP-4 specifically informed the jury that they need not agree on the mitigating circumstances. *See Mills v. Maryland*, 486 U.S. 367, 384 (1988) (sentencing instruction which may have led jurors to believe that they had to unanimously agree on mitigating circumstances required reversal of death penalty). Nowhere in the sentencing instructions was the jury informed that it was required to find any mitigating circumstance(s) in order to impose a life sentence rather than the death penalty. Although Manning's Instructions DSP-7 and DSP-9 (informing the jury that they could return a life sentence without finding any mitigating circumstances) were refused, they were not necessary to instruct the jury on the sentencing process. Moreover, Instruction DSP-9 was properly refused as a mercy instruction. *Lester*, 692 So. 2d at 798.

¶72. The jury was also sufficiently instructed on possible mitigating circumstances in this case. Instruction DSP-10 specifically set out the following mitigating circumstances for the jury's consideration: the

defendant's age, relative intelligence, and mental condition; that the defendant came from an abused family; that the defendant had children at an early age; whether the defendant was under the influence of extreme mental or emotional disturbances; whether the defendant's capacity was substantially impaired; that the defendant came from a poor family; that the defendant was a single parent; and any other circumstances which you deem mitigating. Manning's contention that the jury was not given any non-statutory examples of mitigating circumstances is simply untrue. Miss. Code Ann. § 99-19-101(6) (1994). Furthermore, the use of the catch-all instruction eliminates the possibility "that the jury was unconstitutionally foreclosed from considering all mitigating circumstances." *Berry*, 703 So. 2d at 287. "A catchall instruction is sufficient to encompass non-statutory mitigating factors." *Lester*, 692 So. 2d at 799.

¶73. The ample sentencing instructions in this case sufficiently informed the jury of the process of weighing the aggravating and mitigating circumstances.

## XV.

## THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE BE SET ASIDE.

¶74. In his final assignment of error, Manning urges this Court to reverse his conviction and sentence based upon the cumulative impact of the errors at his trial. A conviction and sentence may be reversed based upon the cumulative effect of errors that independently would not require reversal. *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss.1992); *Hansen*, 592 So. 2d at 153. However, where "there was no reversible error in any part, so there is no reversible error to the whole." *McFee*, 511 So. 2d at 136. Manning's only assignment of error with any merit is the *Batson* issue, which merely calls for remand to the trial court for a *Batson* hearing. *Thorson*, 653 So. 2d at 896. We therefore reject Manning's argument on accumulation of error.

## CONCLUSION

¶75. The trial court erred in overruling Manning's *Batson* objection to the racial composition of the jury without first holding a *Batson* hearing. We must therefore remand this case to the Oktibbeha County Circuit Court for a *Batson* hearing, at which the State will be required to articulate race-neutral reasons for its peremptory strikes on the second venire. In turn, Manning will be given the opportunity to challenge and rebut away such reasons. "If the circuit court should thereafter find purposeful discrimination in violation of *Batson*, it should order a new trial. On the other hand, should no impermissible discrimination be found, the circuit court should by opinion and order make its factual findings and certify the same to this Court." *Thorson*, 653 So. 2d at 896. Manning has failed to raise any other assignments of error on appeal requiring reversal, so we affirm on all other issues.

¶76. **REMANDED TO THE CIRCUIT COURT OF OKTIBBEHA COUNTY TO CONDUCT A** *BATSON* **HEARING; AFFIRMED ON ALL REMAINING ISSUES.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, MILLS AND WALLER, JJ., CONCUR. McRAE AND SMITH, JJ., NOT PARTICIPATING.**

1. Rule 5.02 has been replaced by Rule 3.05 of the Uniform Circuit and County Court Rules.